UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CASE NO.: 8:10-CV-01367-SDM-EAJ


JENNIFER VARTANIAN,
as the Personal Representative
of the Estate of Roobik Vartanian,

         Plaintiff,
v.

OFFICER RICHARD HARRELL,
Individually; and CITY OF TAMPA, Florida

         Defendants.
_____ /


DEPOSITION OF:
**CESARE MYLES**

Taken on Behalf of the Plaintiff

DATE TAKEN:          Friday, January 7, 2011

TIME:                Commencing at 10:00 a.m.

PLACE:               Echo Reporting, Inc.
                     442 W. Kennedy Blvd.
                     Ste. 240
                     Tampa, Florida 33606




Examination of the witness taken before:
Kim Strasser, Court Reporter
Echo Reporting, Inc.
Post Office Box 527
St. Petersburg, Florida 33731

<u>APPEARANCE FOR THE PLAINTIFF</u>

MICHAEL P. MADDUX, ESQ.
Michael P. Maddux, P.A.
2102 West Cleveland Street
Tampa, Florida 33606

ANTHONY T. PRIETO,
Prieto, Prieto & Goan, P.A.
3705 North Himes Avenue
Tampa, Florida 33607

<u>APPEARANCE FOR CITY OF TAMPA</u>

URSULA D. RICHARDSON, ESQ.
City Attorney's Office
315 East Kennedy Boulevard, 5th Floor
Tampa, Florida 33602

<u>APPEARANCE FOR OFFICER RICHARD HARRELL</u>

JOHN A. MAKHOLM, ESQ.
The Makholm Law Group
696 First Avenue North, Suite 205
St. Petersburg, Florida 33701

MARC S. MAKHOLM, ESQ.
The Law Office of Marc S. Makholm, P.A.
806 East Jackson Street, 1st Floor
Tampa, Florida 33602

ALSO PRESENT:  Richard Harrell

## <u>I N D E X</u>

                                                      <u>PAGE</u>
Direct Examination by Mr. Maddux                       3
Cross-Examination by Mr. J. Makholm
Certificate of Oath
Certificate of Court Reporter
Errata Sheet
Letter to Attorney

## EXHIBITS

| 1 | Picture - Van | 17 |
|---|---|---|
| 2 | Picture - Aerial Shot | 17 |
| 3 | Google Map (Attached) | |

1    THEREUPON,

2                        **CESARE MYLES**

3    was adduced as the deponent herein, and being first

4    duly sworn upon oath, was questioned and testified as

5    follows:

6           THE DEPONENT:  I do.

7                   <u>**DIRECT EXAMINATION**</u>

8    BY MR. MADDUX:

9        Q.    Good morning, sir.  Please state your name and

10   your current employment.

11       A.    Cesare Myles, Tampa Police Department.

12       Q.    How long have you been with Tampa?

13       A.    Six years.

14       Q.    Any prior law enforcement training?

15       A.    No.

16       Q.    What is your current position with the agency?

17       A.    Police officer.

18       Q.    Street patrol?

19       A.    SIB Enforcement Group A -- Group 1, excuse me.

20       Q.    Tell me what that entails, please.

21       A.    It is the old gang unit.  Basically, we work

22   gang-related narcotics.  We work -- pretty much it.

23       Q.    Okay.  How long have you been in that

24   position?

25       A.    A year.

1    Q.    Go ahead and take me through your six-year

2    career, all the different positions that you've held

3    when you started off.

4    A.    Uniform patrol first three years.  SAC, two

5    years, which was with the old gang unit, which is now

6    SIB Enforcement Group 1, for a year.

7    Q.    You are sitting next to Officer Harrell.  How

8    do you know him, and how long have you known him?

9    A.    I met him first in FTO and then we were on the

10   SAC Squad together in '08.

11   Q.    So how long in your six-year career would you

12   say that you've served with him?

13   A.    Just on SAC and FTO.

14   Q.    So that is at least two years?

15   A.    Give or take, I guess.

16   Q.    Okay.  And what you just said "give or take"

17   is a great example of how you should answer all of

18   these questions.  I am not here to force feed any

19   answers to you or make you say anything that isn't your

20   truth.  So if you need to correct something, or you are

21   guessing, or you are providing the answer that has

22   equivocation in it, let me know, and the record will be

23   very clear about your answer; okay?

24   A.    All right.

25   Q.    So in the two years that you have worked with

 1     him, has he ever been your partner?

 2          A.    No, just on SAC.

 3          Q.    Tell me a little bit about what SAC stands for

 4     and your duties in that.

 5          A.    Street Anti-Crime Unit.  We basically deal

 6     with street-level crimes:  Burglaries, auto-burglaries,

 7     grand theft, robberies, stuff of that nature,

 8     prostitution too.

 9          Q.    Did you grow up in Tampa?

10          A.    Yeah.

11          Q.    Okay.  Where did you go to high school?

12          A.    Brandon High School.

13          Q.    Did you know you always wanted to be a police

14     officer?

15          A.    No.

16          Q.    Did you go to college?

17          A.    I went to college.

18          Q.    Where did you go?

19          A.    Anderson University.

20          Q.    Where is that?

21          A.    Anderson, Indiana.

22          Q.    And what is the highest level you completed

23     there?

24          A.    BA.

25          Q.    When did you get that?

1    A.    '03.

2    Q.    Why did you sign up with the Tampa Police

3    Department?

4    A.    I graduated in '03 -- I mean '98 in high

5    school, I decided on a career in law enforcement and

6    that is pretty much the path I took.

7    Q.    Do you have a particular personal interest in

8    any aspect?  I mean, you are on the gang unit, you are

9    doing street anti-crime enforcement, but what is your

10   love in law enforcement?

11   A.    I just love the job itself, you know; I love

12   everything.

13   Q.    Okay.  So for you, I mean, it doesn't matter

14   if it is a drug case or gang case, you just like doing

15   your job?

16   A.    I love being a cop.

17   Q.    Do you have a partner right now?

18   A.    We don't -- we work as a collective squad

19   right now; we don't have set partners right now.

20   Q.    Can you give me maybe timewise, maybe month

21   and year, the last time that you were in a direct or

22   indirect working relationship with Officer Harrell?

23   A.    It was 2008 when we were on the SAC Squad

24   together.

25   Q.    Let's go back to 2008 and the SAC Squad.  And

1    run me through a routine day on the squad, what kind of

2    activities you-all were involved in.

3         A.    We have roll call, brief, whatever, hot zones,

4    areas we need to take care of or address, if we need to

5    saturate an area, we will do that; whether it be a

6    spike in burglaries, robberies or whatnot, we focus on

7    a certain area, go out (inaudible) with warrants or

8    whatever, go do pickups, stuff of that nature.

9         Q.    How many people are on the SAC Squad?

10        A.    Counting the supervisors, probably -- it has

11   been a while.  Maybe 10.

12        Q.    The night of the shooting, what district were

13   you working out of or office?

14        A.    District 3.

15        Q.    Where is the main office for D3?

16        A.    It will be the address 3808 22nd Street.

17        Q.    Was one of the places that you might try to

18   saturate or consider a hot zone, Ybor City?

19        A.    Ybor, we are always -- it's called a special

20   assignment in Ybor, Thursday, Friday, Saturday night.

21        Q.    So make sure I understand.  If it is Thursday,

22   Friday, or Saturday night, there is at least a portion

23   of the SAC unit that is doing business in Ybor?

24        A.    Our squad goes signal 15 at a certain time

25   until closing, clear the streets after the bars let

1    out, every Thursday, Friday, and Saturday night.

2            THE COURT REPORTER:  Can you speak up for me;

3       I'm having a bit of trouble hearing you.

4    BY MR. MADDUX:

5       Q.    What does signal 15 mean?

6       A.    Special assignment.

7       Q.    And does that mean, in terms of, that you are

8    actually, physically present there, or just available

9    for an immediate backup?

10      A.    We are all present there, all of the squads

11   there.

12      Q.    Is part of the squad or all of the squad in an

13   undercover capacity when you are doing the special

14   assignment?

15      A.    I think most of us have -- we are in covert

16   vehicles.  I don't know if anyone had a marked unit.

17   It has been a while.

18      Q.    And can you describe what you mean by "covert

19   vehicle"?

20      A.    Unmarked vehicle.

21      Q.    Does an unmarked vehicle have --

22      A.    Just regular unmarked -- not a Crown Vic, just

23   a regular vehicle.

24      Q.    A lot of those are from forfeitures and stuff

25   like that?

1      A.    I assume so.

2      Q.    In terms of police equipment, not police

3   equipment on your body, if you are in one of those

4   covert vehicles, is there any kind of police equipment

5   in those vehicles, those covert vehicles?

6      A.    Some of the guys may have a strobe light for

7   traffic stops.  Some guys may have -- some of the cars

8   may already be equipped with a light and siren, some

9   don't.

10     Q.    What about radios and communication method?

11     A.    We have the little handheld mobile.  I don't

12  think many of them have any radio systems.

13     Q.    Who makes that handheld mobile?  What is the

14  name of that piece of equipment?

15     A.    I couldn't tell you.  I have got my radio in

16  the car, if I get it, I can tell you.

17     Q.    We might do that later.  When you are working

18  on the Street Anti-Crime Unit in Ybor in a covert

19  vehicle that doesn't have a radio, that is your

20  communication system, correct?

21     A.    Correct.

22     Q.    Do you remember the night of the shooting

23  pretty clearly?

24     A.    Most of it.

25     Q.    In preparation for today, have you done

1   anything to review?

2       A.    Yeah.

3       Q.    What have you done in preparation?

4       A.    Read my interview.

5       Q.    You read your interview?  Okay.  That is kind

6   of a key meeting that I would like to focus on, that

7   you just brought up.  When you say, "your interview,"

8   tell me where and what interview you are talking about.

9       A.    The interview regarding the shooting.

10      Q.    Where does your interview take place?

11      A.    411, headquarters.

12      Q.    Is this the morning of the shooting?

13      A.    Yes.

14      Q.    Okay.  Do you know about how long after it

15  would be?

16      A.    I couldn't tell you.

17      Q.    What, as you sit here today, is your

18  recollection of the approximate time of the shooting?

19      A.    I don't have the time of the shooting.

20      Q.    You would rely on your report and the reports

21  of the incident?

22      A.    Yes.

23      Q.    Other than this shooting, have you ever been

24  involved in a shooting, either being the shooter or

25  being with someone who had to shoot someone?

```
 1        A.     On TRT, yes.

 2        Q.     What is TRT?

 3        A.     Our SWAT.

 4        Q.     SWAT.  When would that have been?

 5        A.     When was this?  I want to say '09, '10; it has

 6   been a while.

 7        Q.     Can you give me a paragraph description of

 8   what happened?

 9        A.     It was a bank -- I think a bank robbery

10   suspect.  To make a long story short, they were at the

11   house, one guy starts shooting at us, one of our guys

12   returned fire.  He later committed suicide.  That was

13   it.

14        Q.     Did you actually fire your weapon that day?

15        A.     No.

16        Q.     In the six years, have you ever fired your

17   weapon?

18        A.     No.

19        Q.     What is your firearms experience level, and do

20   you carry a special badge, or are you a master?

21        A.     Pretty much a master.

22        Q.     What does master mean?

23        A.     40 out of 40 every year we qualify, or expert,

24   whatever you want to call it.

25        Q.     How often do you qualify with your firearm?
```

1   What is the requirement?

2       A.    Once a year.

3       Q.    Is that information something that you know

4   about people that you work with, that you make a

5   practice of knowing?

6       A.    Knowing what?

7       Q.    Like, the night that you were working with

8   Officer Harrell, would you have known what his level of

9   proficiency would be with his firearm was?

10      A.    I never asked anybody.

11      Q.    So you are at 411, headquarters, who is

12  interviewing you?

13      A.    I couldn't tell you exact names.  It was Tenda

14  [phonetic] was one, Sonya Wise, and a couple of others.

15      Q.    Was an assistant state attorney there?

16      A.    I believe so.

17      Q.    Have you ever been interviewed like that

18  before about a shooting?

19      A.    I think we all -- I think the day of the SWAT

20  one, we all had a similar -- I don't remember, it has

21  been a while.

22      Q.    Was anyone there from PBA or --

23      A.    I don't remember.  There was a lot of people

24  in there.  I am assuming that they had somebody in

25  there.

1    Q.   Did you ever see the chief of police walking

2  around 411 or being involved in this investigation?

3    A.   I don't remember.

4    Q.   So tell me how you are feeling that night that

5  you are about to give your interview.  What is kind of

6  running through your head?

7    A.   I am all right.  I am calm.  I am just telling

8  my side of the story.

9    Q.   Do you feel like there is any adversity in the

10  room against you?

11    A.   No.

12    Q.   Do you -- would you describe Officer Harrell

13  as a suspect or a victim or neither?

14    A.   Neither.  Still an active investigation.  I

15  couldn't make that determination.  That is for the

16  internal affairs and all of that.

17    Q.   Do you consider this interview to be an

18  interview for purposes of investigating what happened,

19  for purposes of fulfilling IA, what was the interview

20  about in your mind?

21    A.   Both of what you just said, investigatory and

22  maybe a little IA purposes.  I think there was an IA

23  person there.

24    Q.   Did you ever ask for an attorney for your

25  interview?

1      A.    No.

2      Q.    Did you ever feel like you needed one?

3      A.    No.

4      Q.    So all of these people are sitting in the room

5   looking at you, asking you questions, it is a little

6   unusual to be on the answering side of questions in an

7   investigation, right?

8      A.    Not really.  I would expect it at a major

9   scene like this.  I expect the questions will be asked.

10      Q.    Would you agree with the statement that this

11   is only the second time in your career that you have

12   actually been questioned in a formal setting like this,

13   count the SWAT?

14      A.    Give or take, yeah.

15      Q.    What kind of a room are you in when this

16   happens?

17      A.    A big conference room.

18      Q.    What floor?

19      A.    I don't know.

20      Q.    I haven't been on all of the floors of 411 in

21   the blue cube, but is there a certain area of --

22      A.    It is a room big enough for all of the people

23   that house everyone to sit down in.  You know, a room

24   big enough to be interviewed, if that is what you are

25   asking.

```
 1        Q.    Right.  Another thing I am asking is, are you

 2   in the legal section?  Are you in the homicide section?

 3        A.    I couldn't even tell you; it has been a while.

 4        Q.    Are you in the chief's office?

 5        A.    It has been a while; I have no idea.

 6        Q.    Okay.  So in your mind, you are fulfilling the

 7   requirement that you helped them investigate what

 8   happened and determine why the shooting occurred,

 9   correct?

10        A.    Yes, I just answered the questions that they

11   asked me, answered them to the best of my knowledge.

12        Q.    At the point you are answering these

13   questions, how long have you been working about?

14        A.    My career, as far as --

15        Q.    No, that night, hours.

16        A.    I forget what time we got -- I think we

17   started at 4:00, and to 3:30, I think.  4:00 to 3:30.

18   There was a cutoff.  But with the shooting and

19   interviewing, it went way longer than that.

20        Q.    Okay.  So at the point you are doing the

21   interviews, you normally would have been off duty at

22   that point, right?

23        A.    Yeah.

24        Q.    Had you eaten anything, are you drinking

25   coffee?
```

1        A.    As far as the shooting, no.  From the shooting

2    to the interviews, no.

3        Q.    How did you get to the interview?

4        A.    We drove down there.

5        Q.    You didn't go in somebody else's car, you

6    drove yourselves?

7        A.    I think we rode with somebody; I don't

8    remember.

9        Q.    Because one of the questions I wonder about

10   is -- and I am going to mark the pictures Plaintiff's

11   Exhibit 1, and call the first picture with the van A,

12   and the second picture, the -- you know what I am going

13   to do?  I will call the van 1 and aerial 2.

14        (Documents so marked Exhibit Nos. 1 and 2 for

15        identification.)

16   BY MR. MADDUX:

17        Q.    Is the picture that is Plaintiff's No. 1, is

18   that the gray van that you-all were driving that night?

19        A.    That is correct.

20        Q.    So safe to say that you didn't drive down to

21   headquarters in that van?

22        A.    Yeah, we didn't drive in that van.

23        Q.    Did you ever go and visit that van after the

24   shooting?

25        A.    No.

1     Q.    How many times before the shooting had you
2     been in that van driving around?
3     A.    I can't give you a number, several times.
4     Q.    So it wasn't the first time you were in that
5     covert vehicle?
6     A.    No.
7     Q.    Is this, for lack of better terminology, sort
8     of one of the covert vehicles in the stable that you
9     could take out?
10    A.    Yeah, one that we rotate from.
11    Q.    Do you know where that vehicle is today?
12    A.    I couldn't tell you.
13    Q.    And in terms of your recollection, you didn't
14    have sirens?
15    A.    No.
16    Q.    No strobes?
17    A.    No police equipment.
18    Q.    Okay.  How did you get partnered up with
19    Officer Harrell that night?
20    A.    I think we just buddied up that day -- I
21    think, if I remember.  I don't know; it has been a
22    while.
23    Q.    Who was your supervisor in the unit that
24    night?
25    A.    John Haggard or Sergeant Haggard.

1     Q.    Was he somebody that you were accustomed to

2     being your supervisor in the unit?

3     A.    Yeah, he was my sergeant.

4     Q.    So you had worked under him for a little

5     while?

6     A.    Well, just for that year, yeah.

7     Q.    What was your working relationship like with

8     him?

9     A.    Good.  Everybody got along.

10     Q.    Is he the one that would dole out the

11     assignments or did he give you discretion?

12     A.    Both.  A little bit of both.

13     Q.    As I understand it, you were performing some

14     sort of auto burglary covert, you know, suppression and

15     apprehension of criminals in Ybor that night; is that

16     accurate?

17     A.    It has been a while; I believe so.  Every so

18     often we will do different operations within Ybor or

19     outside of Ybor.

20     Q.    Does Ybor have an auto burglary program?

21     A.    Every now and then it does.

22     Q.    Tell me, in your own mind, based on your years

23     doing special assignments in Ybor, what are the

24     names -- give me top five problems you deal with in

25     Ybor?

1      A.    Fights, drunks, thefts, a robbery every now

2   and then, every now and then stabbing, just crime in

3   general.  It is Ybor City, Ybor City will always have

4   issues, with large crowds coming down.

5      Q.    Have you ever been Mass Incident Response

6   Trained, MIRT?

7      A.    Yes.

8      Q.    When did you do that?

9      A.    Some years ago; I don't remember.

10     Q.    Other than the SAC assignments that you had in

11  Ybor, have you ever been special assigned to Ybor in

12  general, like, you know, work street patrol in Ybor?

13     A.    Yeah, I was, you know, in uniform.  I was, you

14  know -- it wasn't my zone, but I took calls and

15  patrolled the entire south end sector, which is where

16  Ybor is.

17     Q.    What is your -- I am kind of bouncing around a

18  little bit, but while it is in my mind, I want to say

19  it.  What is your history in sports and athletics?  Are

20  you an athlete?

21     A.    Yeah, I played football.

22     Q.    What did you play in high school?

23     A.    Linebacker.

24     Q.    How much do you weigh?

25     A.    Right now, 205.

1      Q.    Is that pretty much a consistent weight for

2  you?

3      A.    Yeah, pretty much right now.

4      Q.    Do any other sports?

5      A.    I was in high school -- I ran track in high

6  school, and junior high I was in football and track.

7      Q.    Back around '08, were you lifting weights?

8      A.    Yeah.

9      Q.    Do you lift weights still?

10     A.    Yeah.

11     Q.    Are there any problems with your eyesight?  Do

12  you have contacts?

13     A.    Yes.

14     Q.    What is your vision; do you know?

15     A.    No.

16     Q.    You don't know?  Do you wear glasses, if you

17  don't have contacts?

18     A.    Yes.

19     Q.    Are you nearsighted or farsighted?

20     A.    Near.

21     Q.    Did you have your contacts in the night of the

22  incident?

23     A.    I don't remember what I had on, one or the

24  other.

25     Q.    Fair to say you don't work without having some

 1   sort of visual assistance, right?

 2        A.    Right.

 3        Q.    And I would imagine that when you shoot, when

 4   you are getting certified, you have visual assistance?

 5        A.    Right.

 6        Q.    Where do you get into your van that night?

 7   Where would you get that?  Did you get it at

 8   headquarters or is it parked somewhere else?

 9        A.    At the district.

10        Q.    So what were you typically doing, start

11   timewise, like when would you have gotten in the

12   vehicle and headed out?

13        A.    After we got done briefing.

14        Q.    Were you driving or passenger?

15        A.    That day, I was a passenger.

16        Q.    Is that something that you-all kind of

17   predetermine that for the evening you will be the

18   passenger, or is it something that you could change in

19   the middle of the night?

20        A.    We could change, but for the most part whoever

21   is the driver is the driver and whoever is passenger is

22   the passenger.  We will rotate each day, then the next

23   someone else will drive, someone else will be the

24   passenger.

25        Q.    So you were the designated passenger?

1    A.    Correct.

2    Q.    Tell me what you are wearing that night.

3    A.    My raid vest, badge, gun, vest, other stuff on

4    my pouch, which is on my vest, radio, I think my Taser.

5    Q.    I will start all the way with your shoes; what

6    kind of shoes are you wearing?

7    A.    Either tennis shoes or boots; I don't

8    remember.  It has been a while.

9    Q.    Is that -- that is not something that you

10   would wear with your standard uniform, correct?

11   A.    Tennis shoes, no.

12   Q.    So they are not like the black shoes that you

13   wear with your standard uniform, correct?

14   A.    No, with the uniform you can't wear tennis

15   shoes.

16   Q.    Can you wear jeans?

17   A.    Am I wearing jeans that night?

18   Q.    Yeah.

19   A.    I believe I was.

20   Q.    And the raid vest is black and it has, what,

21   yellowish "police" on it, or --

22   A.    Yeah, "police" on the back and "police" on the

23   side -- left or right side, I forget, but, yeah.

24   Q.    What is your understanding of the purpose of

25   that style of uniform?

1      A.    Is to be visible, you know, so someone can

2      identify you as a police officer.

3      Q.    Okay.  If you are going to do that, why aren't

4      you dressed like Officer Harrell today in full garb?

5      A.    That is a different uniform, Street

6      Anti-Crime, two different units.  Street Anti-Crime is

7      plain clothes.

8      Q.    The way I see it, and I want you to correct me

9      because you are you the one -- this is your job, so you

10     know.  The way I see it is, there is a guy in full

11     uniform like Officer Harrell, and there is plain

12     clothes.  And what you guys are wearing that night is

13     kind of in the middle.  It is not truly plain

14     clothes --

15     A.    When you say "plain clothes," are you

16     referring to -- I think you are thinking like

17     undercover, like VICE or something like that?

18     Q.    Right.

19     A.    That is VICE, street crimes, or SAC, and

20     uniform, that is two, three different units.  You know,

21     for SAC, that is our dress attire:  Regular clothes or

22     street clothes with a raid vest, gun, all of that, so

23     we can be identified.  Uniform is uniform.

24     Q.    Makes you a little less obvious, but once you

25     get out you should be recognized; is that the idea?

```
 1      A.    Yes.  With all of that stuff on, you can't

 2  hide it that you are the police with all of that stuff

 3  on.

 4      Q.    When you say you had your gun, was your gun on

 5  an official belt like he is wearing (indicating), with

 6  all of that equipment, or is it kind of a scaled down

 7  belt?

 8      A.    Scaled down belt.

 9      Q.    Okay.  What other weapons would you have been

10  carrying?

11      A.    I believe my Taser.  I don't remember.

12  Usually I carry my Taser.

13      Q.    Did you have your asp?

14      A.    I don't think so.

15      Q.    Flashlight?

16      A.    I usually have a light with me.

17      Q.    What kind of firearm were you carrying?

18      A.    That night?

19      Q.    Yes.

20      A.    Oh, man, it has been a while; it was either my

21  SIG or Glock 9, one of them.

22      Q.    So you guys get in the van, Harrell is

23  driving, what are you guys going to do?  What are you

24  doing that night?

25      A.    We are just patrolling, trying to see what we
```

1    can see, prevent what we can prevent.  We are just

2    there.

3        Q.    So putting eyes to problems?

4        A.    Pretty much.

5        Q.    Are you tasked to look for certain kinds of

6    problems that night?

7        A.    Anything and everything.  Ybor is zero

8    tolerance.  What we see, we intervene and deal with it.

9        Q.    I do understand the part of what you were

10   doing is auto burglary enforcement.  How would you go

11   about preventing the auto burglaries?

12       A.    Set up in a parking lot, you can drive through

13   and watch, sit somewhere in a target parking lot or

14   where a lot of vehicles are parked at and sit and

15   watch.

16       Q.    Did you do some watching that night before the

17   shooting?

18       A.    Yes.

19       Q.    Did you make any arrests before the shooting?

20       A.    Not that I remember.

21       Q.    Was there any -- is it typical that you will

22   have multiple arrests in one night?

23       A.    Some nights, yeah.

24       Q.    Does your sergeant, does he give you like a

25   priority and wants you guys focusing on certain things?

     A.    Sometimes.  If it is a problem that we need to

address.

     Q.    Now, did you know Mr. Vartanian?

     A.    No.

     Q.    Had you ever met him before, to your

knowledge?

     A.    No.

     Q.    And in terms of the club that he was working

at, Club Prana, do you have any particular knowledge or

experience of that club, like what its reputation might

be after all of your law enforcement experience in Ybor

City?

     A.    It is just another club in Ybor City.

     Q.    My experience in taking officer's depositions

that work in Ybor is that they sort of have an idea of

certain kinds of clubs having certain kinds of patrons

that create certain kinds of problems.  Do you have any

kind of mental association with Prana?

     A.    All of the clubs have potential of patrons

starting problems within all of the bars.  But as far

as Prana -- if you are asking if it is a problem club,

I mean, all of the clubs, you know, have problems, you

know, within each club, so --

     Q.    Okay.  You think of Prana as having any kind

of cultural or ethnicity mix?

1    A.    Different people, you know, like blacks,

2  Hispanic, all the people go to the clubs and bars in

3  Ybor.

4    Q.    Okay.  Had you ever been inside before the

5  shooting, inside the club?

6    A.    I have been in there.

7    Q.    What would the occasion have been for that?

8    A.    Just hanging out with my girl.

9    Q.    So as a patron?

10    A.    Yes.

11    Q.    But not for law enforcement purposes?

12    A.    I've been in there maybe a couple times for

13  law enforcement.

14    Q.    What kind of stuff would that entail?

15    A.    Dealing with a fight or something like that.

16    Q.    Have you, since the shooting, ever gone to

17  Prana to do any kind of followup investigation?

18    A.    After the shooting?

19    Q.    Yes.

20    A.    No.

21    Q.    Okay.  Have you done any kind of followup

22  investigation, either because you have been instructed

23  to do so or privately concerning the shooting?

24    A.    No.

25    Q.    Have you interviewed any witnesses concerning

1    the shooting?

2       A.    No.

3       Q.    Have you ever had contact with any family

4    members?

5       A.    No.

6       Q.    Have you ever talked with Officer Harrell

7    about the shooting?

8       A.    No.

9       Q.    So going to that interview room that night and

10   being debriefed, prior to that, you had not spoken with

11   Officer Harrell about how the shooting went down?

12      A.    Not about the shooting.

13      Q.    What would you have talked to him about before

14   you got in the interview room?

15      A.    I don't remember.

16      Q.    Would you have been expressing, you know,

17   support of him?  I mean --

18      A.    Just support:  It will be all right, don't

19   worry about it.  But as far as details, no.  We were

20   pretty much -- I think for the most part, they wanted

21   to keep us separated.

22      Q.    Were you told to stay away from him after the

23   shooting?

24      A.    Well, you know, just don't talk about it, or

25   issues like that.

1       Q.    What was the first post-shooting contact that

2    you had with Officer Harrell?  I am looking right after

3    the shooting, what the first time that you are really

4    able to be in his presence?

5       A.    I can't tell you.

6       Q.    Okay.  I am going to just give you some of my

7    predictions and see if maybe it refreshes your memory,

8    because I want this depo to be like you are there that

9    night, because I need you walking in your own shoes

10   that night so you can articulate what happened.

11           I am not looking for a report version of the

12   events; I am looking for real live action from you,

13   okay?  And I am imagining, if I am in shoes I might be

14   standing by my partner, making sure he is okay.  Do you

15   recall that happening?

16      A.    Support, yeah.  But after the interviews,

17   pretty much went home.  I went home, he went his way.

18      Q.    I am after shooting, not after interviews.  I

19   am in the time in between the shooting and your

20   interview.  What contact are you having with him now?

21      A.    I can't tell you; it has been a while.

22      Q.    Okay.  So you are sitting in your vehicle

23   before you even roll down that alley, and what is

24   happening right now?

25      A.    Just -- I think my interview is, a party on

1    north side, party on the south side, verbal, just going

2    back and forth.

3        Q.    How do you know about the verbal?  Why are you

4    in that area?

5        A.    Just patrolling, just routine, just patrolling

6    the area.

7        Q.    Are you kind of doing a lap of a certain set

8    of streets?

9        A.    No, we are all over Ybor, we are not set.  We

10   are not tied down to one street.  We are Ybor City,

11   entertainment district, the whole area, so we patrol

12   all over Ybor.

13       Q.    Are you getting a dispatch about activity --

14       A.    No dispatch, just roll up on it.

15       Q.    Just roll up.  Which way did you come from in

16   terms of --

17       A.    West to east.

18       Q.    West to east?  Okay.  And before -- because I

19   am looking at the first picture (indicating), which you

20   have got in front of you, and so at the point that the

21   van is in this photograph (indicating), it is pointing

22   east, right?

23       A.    That is east.

24       Q.    So if you look at the second (indicating),

25   which is the aerial of the area.  And sort of a frame

1    of reference, there is what looks like, to me, at the

2    bottom center almost, a peak that is probably part of

3    the parking garage or something.  Do you see what I am

4    talking about?  Sort of like that peaked roof?

5         A.    Yeah.  I don't know what the roof of the

6    parking garage looks like, but I will take your word

7    for it.

8         Q.    I am trying to give you a frame of reference.

9    Is that sort of at the bottom of the alley where you

10   entered and then started heading towards the east?

11        A.    Yeah, the alley is right here (indicating).

12        Q.    Okay.  Do you remember, were you driving north

13   or south as you approached the alley?

14        A.    I think there is only one way you can from

15   16th Street, coming from the north and make a right.

16        Q.    Okay.

17             MR. J. MAKHOLM:  Excuse me one second.  What

18        are you calling the alley?

19             MR. MADDUX:  Sure.  That is a good question.

20        We are calling the alley this area right here

21        (indicating), in front of the building where

22        Vartanian lived.

23             MR. J. MAKHOLM:  Isn't that a street?

24             MR. MADDUX:  I will be happy to call it a

25        street, if you want.

1        MR. J. MAKHOLM:  I think we should call it

2     what it is for future reference.

3        MR. MADDUX:  Sure, not a problem. I will

4     rephrase.

5  BY MR. MADDUX:

6     Q.    I believe you said you were driving north and

7  took a right onto the street?

8     A.    I don't now if we came north or south, but you

9  can come south, it is the wrong way, but we are law

10 enforcement, we can do that if we need to get

11 somewhere.  But generally speaking you can go north and

12 then east on 6th Avenue.  It is not an alley, it is 6th

13 Avenue.

14    Q.    Okay.  So it is 6th Avenue (indicating), and

15 this is 16th (indicating)?

16    A.    16th Street.

17    Q.    Okay.  So as you are rolling down 16th Street

18 approaching the street, which is 6th Avenue --

19    A.    6th Avenue.

20    Q.    -- are you in an emergency mode?

21    A.    No, just still patrolling, cruising.

22    Q.    And visually, you are seeing activity where?

23 You want to maybe take your pen and mark it

24 (indicating), maybe circle where you are seeing the

25 activity that you described as two groups?

1      A.      Probably mid-block.  I don't know which one of

2   these buildings is Prana.  But mid-block, whichever one

3   of these buildings (indicating) is closer to Prana, it

4   is in that area.

5      Q.      Go ahead and do a big circle that you think

6   will capture it, even if it is not exactly where it is.

7      A.      I will mark it halfway through, to be on the

8   safe side (indicating).

9      Q.      Okay.  So you've circled a pretty big area,

10   and you would be on 16th visualizing that?

11      A.      Yeah.

12      Q.      Okay.  What is in your mind, now that you are

13   seeing it?  What do you think is going on?

14      A.      Right now, just an altercation, just a verbal

15   argument between two groups of guys.

16      Q.      Can you hear anything?

17      A.      Yeah.

18      Q.      What can you hear?

19      A.      Yelling, cursing, just going back and forth.

20      Q.      So your windows are down?

21      A.      I don't remember if the windows are down or

22   up, but they were pretty loud.  We can hear it.

23      Q.      Are you seeing anyone moving their hands and

24   gesticulating like they are --

25      A.      Yes, they were all gesturing, going back and

1    forth.  Most people talk with their hands anyway, if

2    they are upset, yelling.

3        Q.    Did you see a firearm at that point?

4        A.    No.

5        Q.    What is your perceived level of the threat at

6    this point?

7        A.    It is low right now, just a verbal.

8        Q.    And still no dispatches coming in about

9    somebody chasing somebody with a gun?

10       A.    No.

11       Q.    Did you ever get a dispatch like that, that

12   night?

13       A.    No, not prior to -- as far as the verbal that

14   we rolled up on, no.

15       Q.    And what is your partner telling you at this

16   point, or what are you telling your partner?

17       A.    We both agree to sit and hang out and watch

18   and make sure this doesn't escalate to nothing.

19       Q.    Where do you decide to sit and hang out?

20       A.    Probably -- obviously, right there, mid-block

21   through.  I don't know feet-wise, but in the area, so

22   we can watch.

23       Q.    At what point are you going to blow your cover

24   and let everyone know the cops are there?

25       A.    I think pretty much my partner -- Rick, he

1    yells "gun," and we both exit the vehicle, and pretty

2    much the jig is up.  We run out, he takes a shot, comes

3    around the back end -- I guess when we exit the

4    vehicle, the cover is blown now, because we are dressed

5    the way we are dressed, to answer your question.

6        Q.    So you exited the vehicle because you saw a

7    gun?

8        A.    No, because my partner alerted, said, "gun,"

9    as he is exiting; I exited with him.

10       Q.    Okay.  So your partner notifies you, and he is

11   the first one to see the gun?

12       A.    Yes.

13       Q.    And as you are exciting the vehicle, are you

14   seeing the gun?

15       A.    No.

16       Q.    Did you ever see a gun before --

17       A.    Not --

18       Q.    -- Officer Harrell fired?

19       A.    Not prior, no.

20       Q.    After you see who has been shot, which is

21   Mr. Vartanian, who is a pretty sizable character, kind

22   of unique look, can you now go back to you sitting in

23   the police vehicle and tell me anything that you

24   remember about what that person out of the crowd did?

25   Do you have any recollection of Mr. Vartanian?

1      A.    No.

2      Q.    So you can't attribute any particular

3    gestures, any particular words --

4      A.    No.

5      Q.    -- or any particular movements to him,

6    correct?

7      A.    Correct.

8      Q.    You have gone over how you-all were sitting,

9    but I want to make sure I am right.  Officer Harrell

10   would have been the closest to the altercation?

11     A.    He is on the driver side, I am on the

12   passenger side.

13     Q.    And before he exited the vehicle, did y'all

14   ever have a discussion about getting out?

15     A.    No, just kind of sit and watch and observe.

16     Q.    Did y'all ever have any kind of loud speaker

17   in that vehicle?

18     A.    No, there was no police equipment in that

19   vehicle.

20     Q.    Prior to exiting, did you ever call for a

21   backup?

22     A.    No.

23     Q.    How many people would you say that you were

24   dealing with out between the two crowds?

25     A.    Gosh, it has been a while, a group on the

1    north side, maybe five-plus people, six.  And there

2    were two guys on the south side.  It has been a while;

3    I am guessing.  Definitely two on the south side.  The

4    group on the north, you know, it was definitely more

5    than three or four.

6        Q.    Where are the two guys on the south side?

7        A.    They are south of the tracks, if I remember.

8        Q.    In relationship to your vehicle, where are

9    they, to your left or right?

10       A.    To -- they will be south of me, so to my

11   right.

12       Q.    Now, are you familiar with the parking area in

13   the back behind 6th to the south?

14       A.    No, I would have to go back and look at it.

15       Q.    Can you tell me, this larger sort of

16   condo/apartment building, were they along this edge in

17   the back (indicating)?

18       A.    There is a field -- let me see.  I don't know

19   if this picture (indicating) shows it, but there is an

20   open field, they were walking south, you know, from the

21   tracks, and just kept going backwards towards this

22   field.  There was another grass area, designated

23   parking lot area.

24       Q.    Do you feel like your attention was

25   particularly focused on them since they were on your

1   close side?

2       A.    I was looking at both groups.

3       Q.    Did you ever see those two men -- can you

4   describe them for me?  Do you know if they were white

5   or black?

6       A.    If I remember, black males; I don't remember

7   exactly.

8       Q.    Did you ever have any contact with them after

9   the shooting?

10      A.    Yes.

11      Q.    We will talk about that.  Did you see where

12  they went or what they did back then?

13      A.    Prior, during, or after?

14      Q.    Prior to the shooting.

15      A.    They were still, you know, going back and

16  forth, and just sort of walking back and forth and

17  jaw-jacking.

18      Q.    What were they saying?

19      A.    I couldn't tell you verbatim, just going back

20  and forth, yelling at the other crowd, and words were

21  exchanged.

22      Q.    Can you quote anybody or any group?

23      A.    No.

24      Q.    Could you tell if it ever got racial?

25      A.    No.

1        Q.    Did you ever see anyone actually go up to the

2    front door of this building (indicating)?

3        A.    No.

4        Q.    Did you ever see the two, what you believe

5    might have been black males, to the south of you, go to

6    their vehicle?

7        A.    No.

8        Q.    How long are you sitting there observing this

9    scene from your parked location before the shooting --

10   before Officer Harrell actually rolls out of the

11   vehicle?

12       A.    It wasn't long, maybe 10-plus seconds.  It

13   wasn't long.

14       Q.    What is Officer Harrell saying as he makes his

15   departure?

16       A.    He yells, "gun."  I am running, pretty much --

17   you see the picture here (indicating) -- in this

18   direction, around the driver's side, because he exited

19   in this direction (indicating), so I am coming around

20   this way (indicating).

21            He yells, "gun."  As he is yelling, "gun," as

22   I am coming to the rear -- prior coming to the rear,

23   "police, drop your weapon."  One shot is already fired.

24   As I come around, I see, I think Mr. Vartanian, he is

25   already hunched -- starting to hunch over.  He is going

1    to the ground.

2        Q.    So in terms of time, you did not even clear

3    the back end of the vehicle before the shooting had

4    occurred; is that fair to say?

5        A.    That is correct.

6        Q.    And is it fair to say that you were moving in

7    a hustling fashion?

8        A.    I was moving in a hustling fashion.

9        Q.    And what specific verbiage are you saying that

10   you heard Harrell say?

11       A.    He yelled, "gun," and "police, drop your

12   weapon."

13       Q.    How many times did he say, "police, drop your

14   weapon"?

15       A.    Just the one time I heard.

16       Q.    And was it immediately after that that you

17   heard one shot?

18       A.    One shot, yeah.

19       Q.    You hear the shot, how are you feeling

20   emotionally?

21       A.    I am still -- I am in cop mode; I am still

22   going to handle my job.

23       Q.    Okay.  Well, as you clear the corner, is there

24   any kind of question in your mind or your heart about

25   who was on the receiving end of the gunfire?

1      A.    No.   Like I said, I turned the corner, I could

2    see the guy hunching over.   Rick is covering him at

3    this point, so --

4      Q.    Was there ever any kind of warning given

5    before Officer Harrell got out of the vehicle about

6    your presence as police or for the person to drop their

7    gun?

8      A.    You mean before we -- before he yelled, "gun"?

9      Q.    Yes.   In other words, before he exited and

10   what you just described, did anyone ever scream out the

11   window or say, police, drop your weapon?

12     A.    No, no, not sitting in the car as he is

13   yelling, gun.   He is already exiting the vehicle.   As I

14   am coming around, he says, "police, drop your weapon."

15   At the corner, one shot has already been fired.   Like I

16   say, when I come around the end of the van, he is

17   already hunching over, falling to the ground.

18     Q.    How far away, as you round the corner of the

19   van, is Officer Harrell from the decedent?

20     A.    I couldn't tell you exact feet.   I couldn't

21   tell you, maybe 20, 25 feet.

22     Q.    In this first picture (indicating), which

23   captures the tracks in the lower right-hand corner, was

24   Mr. Vartanian on the south side of the tracks?

25     A.    I don't remember.

1      Q.    Okay.  Is it fair to say Mr. Vartanian's body

2   would be over here (indicating)?

3      A.    North of us.  It was north of the van,

4   obviously, but I can't tell you in exact -- it has been

5   a while -- the exact position.

6      Q.    Do you know if Officer Harrell went around the

7   tree or in front of the tree that is depicted in the

8   picture?

9      A.    I wasn't paying attention.  When he yelled,

10   "gun," I was getting out expeditiously, and came out to

11   see what he sees and back him up.  I can't tell you if

12   he went around the tree or in front of it, I couldn't

13   tell you.

14      Q.    And in your mind, knowing what happened, what

15   factors necessitated confronting the person with the

16   gun?

17      A.    As far as after he shot him?

18      Q.    No, as far as even getting out of the van.

19      A.    I got out of the van; he alerted me to the

20   gun, so -- I don't know what he saw -- he must've saw

21   something, obviously.  So to back him up in good faith,

22   I exited the vehicle.  I exited the vehicle with him.

23   I am not going to let him go confront somebody that he

24   is yelling, "gun," by himself.  So as a good partner,

25   he yelled, "gun," I went out there to back him up.

1      Q.    Is there a reason that you went towards the

2   back of the van or towards the front?

3      A.    When he exited, he didn't run around this way

4   (indicating), to the south, he continued like this

5   angle (indicating), this direction (indicating), so I

6   kind of meet him this way (indicating), as he is

7   somewhere exiting in this direction (indicating), I

8   went around the back end.

9           If he would have came around the front end, it

10   would have been easier for me to come around, but he

11   didn't go this way (indicating), he went this

12   way (indicating), like a northern direction.

13      Q.    How far away from the van is Harrell standing

14   when you come around the corner?

15      A.    I couldn't tell you; I don't remember.

16      Q.    I mean, is it fair to say he wasn't standing

17   up by these tracks, correct?

18      A.    I don't remember.

19      Q.    What is the first thing you are doing now,

20   that the gun is being discharged?

21      A.    Right now, as I am coming around the corner,

22   he is covering Vartanian, or Mr. Vartanian.  By this

23   time, I am coming around the group of guys on the north

24   side, start approaching Rick from behind.  He don't see

25   this group because he is focusing on this guy.  So I

1    come around, you know, to get those guys distance, back

2    off from him, "back up.  Get the fuck back.  Get the

3    fuck back."  "Whoa, Officer, it wasn't me.  It wasn't

4    me."  They pointed at the other two guys.  They said,

5    "these two guys, they have got the gun."  They

6    complied.

7         I go after these two guys.  The other two

8    guys, I guess they see him pointing in their direction

9    as they are telling me, "hey, it wasn't me, it is these

10   two guys."  And I go over there, they comply, prone

11   them out, as I came within so many feet, at gunpoint.

12   By that time units are already coming.  The radio has

13   been -- Rick got on the radio and called for units, the

14   whole nine, after the shooting.

15        Q.   Did the group on the north side of the tracks

16   get prone?  Did you draw on them and make them get

17   down?

18        A.   No, I didn't prone them out.

19        Q.   But you did the two men in the alley?

20        A.   The two men in the alley.

21        Q.   So about how many people after the shooting

22   are you confronting on the north side of the tracks

23   that are standing right there?

24        A.   I couldn't tell you; it was several of them.

25        Q.   Can you leave room for the possibility that

1    those people saw what happened?

2         A.    Yeah, they were there, I am assuming that they

3    were part of that group, they were right there.  They

4    got their recollection of what occurred that night,

5    obviously.

6         Q.    Did you interview any of those people?

7         A.    No.

8         Q.    You did say that you spoke to the two men in

9    the alley.  Where and what did they tell you?

10        A.    No, I just detained them; I didn't interview

11   them or get a -- I just detained them, patted them down

12   for the gun, and tell them, hey, sit tight and until we

13   work this out.  They both complied.

14        Q.    Did you have to cuff them?

15        A.    Yeah.

16        Q.    Did you stick them in a police vehicle

17   anywhere?

18        A.    Eventually, I think we put them in police

19   vehicles.

20        Q.    It is a pretty exciting moment right there, I

21   and I don't mean in a good way, but I mean somebody has

22   been shot, they are possibly a part of it, you have

23   prone them and draw down on them.  What are they saying

24   in the heat of the moment?

25        A.    I couldn't tell you verbatim.  They were both

1    arguing with these guys and not really saying much.  I

2    didn't make them say too much until we got officers on

3    scene, so they could sit down and give a formal

4    interview.  I didn't have them really go into details

5    and all of that.

6        Q.   Did they say anything about the shooting:  Oh,

7    my God, I can't believe you shot that guy?

8        A.   No, not that I recall.

9        Q.   How long are you back there with him before

10   you are relieved?

11       A.   Not long, a few minutes, a minute, I can't

12   tell you.  It wasn't that long.  Units -- when I called

13   for another unit, I think he got on the radio, I don't

14   know if I got on the radio, but I needed another set of

15   handcuffs.  I only had another set on me.  I think my

16   corporal came over and gave me another set of cuffs.  I

17   can't tell you how long that was.

18       Q.   Did you announce that shots had been fired

19   over your radio?

20       A.   I think Rick called it out --

21       Q.   Okay.

22       A.   -- over the radio.

23       Q.   When you see a gun and you make a move towards

24   somebody carrying a gun, are you supposed to call a

25   certain thing on the radio to notify other units?

1   A.   Yeah, police involved, shooting, send us

2   units.

3   Q.   What about as you were rolling out, knowing

4   that he was making an emergency move towards somebody

5   carrying a gun, are you supposed to be calling --

6   A.   Well, in that situation, he is still covering

7   this guy -- there is a group of guys converging on

8   Rick, you know, so I need to make sure he is safe

9   first.  That is what I did.  I drew down on those guys

10  to create that distance.

11      I don't if know these guys are armed or what

12  have you, or if they are trying to ambush, I don't

13  know.  So to create that distance first, get them back,

14  which they complied.  I went to get these guys, and I

15  am already on the radio, but -- units were called out.

16  So until these guys were backed up, they complied.  I

17  went and detained these guys, and they say, "they got

18  the gun, they got the gun."  I went and got those guys.

19  Q.   Okay.  But on your way out of the passenger

20  seat to help your partner, did you make any radio

21  calls?

22  A.   I didn't make any radio calls.

23  Q.   Were either one of your wearing bullet proof

24  vests?

25  A.   I was wearing my vest, if I remember.

1        Q.     Does Officer Harrell stay with Vartanian?

2        A.     Yeah, pretty much, he is covering, he is

3    staying with it.

4        Q.     Do you ever hear any threats from anyone in

5    the crowd towards the police?

6        A.     No, I was way with the other two, a little

7    south.

8        Q.     Who do you see arriving at the scene?

9        A.     Multiple officers on scene, a lot of officers

10   on scene.

11       Q.     When do you reconnect with Officer Harrell

12   before your interview?

13       A.     I think when the IA or shoot guys or whatever

14   says, hey, just sit tight, we will get you down and get

15   you interviewed.

16       Q.     Do you write a report in this case?

17       A.     No, I didn't write -- I didn't write any

18   report on this one.

19       Q.     Did you collect any evidence?

20       A.     No.

21       Q.     You didn't talk to Officer Harrell before

22   today's depo?

23       A.     No, not today.

24       Q.     Or any time?

25       A.     He called me to remind me, hey, to come,

1    but --

2        Q.   As far as what happened in the substance of

3    the thing?

4        A.   No.

5        Q.   What about any of the attorneys involved, have

6    you talked to them?

7        A.   Just Ursula calling, reminding me when the

8    depo was.

9        Q.   But you didn't review your testimony?

10       A.   No.

11       Q.   Thank you for appearing, by the way.

12            So as you sit here today, you reviewed your

13   statement that you gave that night; is there anything

14   about that statement that you wanted to change?

15       A.   No.

16       Q.   Are there any SOPs that you are aware of that

17   kind of control this situation about how you are

18   supposed to properly approach someone with a firearm?

19       A.   I don't know of any SOPs, but training, if

20   someone has a gun, just generally speaking, that is,

21   assert deadly force or lethal situation, whether it is

22   pointed at you or not.  You are not going to walk up

23   with someone that has a gun, you know, that doesn't

24   make sense, you know, being a cop.

25       Q.   You have had time to think about it, it has

1     been a while since the shooting; how could this have

2     turned out differently?

3          MS. RICHARDSON:  Object to the form of the

4     question.

5          THE DEPONENT:  I mean, with these altercations

6     or verbals, you know what I mean, they happen all

7     of the time.  A lot of times with that group

8     walking away, I didn't think this was going to

9     happen.  I didn't see, you know, a weapon

10    introduced or anything.  So all we have got now, at

11    least to my eyes, is a verbal.  These guys are

12    walking away, they are just going back and forth.

13    We see that all the time in Ybor.  It is no big

14    deal.  There is no fight or crime right then and

15    there for us to intervene.  So I don't know if that

16    answers your question.

17  BY MR. MADDUX:

18    Q.   Well, at what point is a verbal altercation

19  going to warrant you guys revealing your cover?

20    A.   I mean, when the verbal starts, when guys

21  start getting -- the distance starts getting closer and

22  closer, we are getting ready to go fist to cuffs now.

23  Prior to that, we would have come out and break up a

24  would-be fight.  From my eyes, from what we saw -- from

25  what I saw, I can't speak for Rick or the other two

1    gentlemen on the south, who were walking away, still

2    jaw-jacking, same with these guys, but that is pretty

3    much what I saw that night.

4        Q.    Do you think it would have been possible for

5    you guys to roll up in between them, tell the south

6    guys, take off, police; and Officer Harrell tell the

7    north guys, it is time to end this, take off?

8        A.    Yes, it is possible, but these guys were

9    already leaving.  They were already walking away.

10   So either way they were already exiting.

11       Q.    Is it fair to say that you don't necessarily

12   agree that the most prudent move was to get out of the

13   vehicle at the point that the weapon was seen?

14       A.    Do I agree?

15       Q.    Yeah, that that wasn't the most prudent move?

16           MS. RICHARDSON:  Object to the form of the

17       question.

18           THE DEPONENT:  What are you saying?

19   BY MR. MADDUX:

20       Q.    Okay.  I am asking you, do you think that was

21   a smart move, to get out of the vehicle, just because a

22   gun was seen?

23       A.    Yeah.

24       Q.    Why was that a smart move?

25       A.    Obviously, I didn't see the gun, but a law

1    enforcement officer sees a gun in someone's hand in

2    public, that is something that we need to address right

3    then and there; not something that we are just going to

4    let some guy just walk around with a gun.  That doesn't

5    make sense.

6         Q.   Well, how would you confront somebody that has

7    a firearm, normally?

8         A.   "Police, drop your weapon," verbal commands,

9    and then from then on, the suspect's actions will

10   dictate what happens next.  Whether you prone him out,

11   drop the gun, put him in handcuffs and wait for units,

12   the whole nine, or if you need to use your force, then

13   you have got to do what you have got to do.

14        Q.   Do you know if Officer Harrell exited the

15   vehicle with his gun drawn?

16        A.   I didn't see him drawing.  I am assuming he

17   was exiting.  As he yelled, as I am exiting, I am

18   drawing for my weapon, because he said the word "gun,"

19   so I am assuming that he did that.

20        Q.   What have you since learned about why

21   Vartanian had the weapon?

22        A.   I didn't learn anything.  From what it came

23   out, he had a gun on him that night.

24        Q.   So you don't have a clue why he had the gun?

25        A.   No.

1    Q.   As a police officer, does it make a difference
2    why somebody has a gun?
3    A.   It would be nice to know.  I don't know if he
4    asked him if he has a CCF or security license for a
5    firearm, I don't know.  All I know, when prior and
6    after he was shot, he had a gun on him, so that was --
7    I found that out, he did have a gun on him.  But why he
8    had a gun, I can't answer that question.
9         MR. MADDUX:  I am probably going to take like
10        a three-minute break, talk to Anthony, and finish
11        up.
12        MS. RICHARDSON:  I don't have any questions.
13        MR. J. MAKHOLM:  A couple, depending on what
14        else you ask.
15        MR. MADDUX:  Okay, sure.  Take a couple
16        minutes.
17        (A recess was taken.)
18   BY MR. MADDUX:
19   Q.   Going back to the first picture.  And the
20   altercation that you were seeing between the north and
21   south groups.  Did your van roll past the altercation?
22   A.   No, we were -- no, I don't think we rolled
23   past it.  We were at a distance where we could see both
24   groups.  If I am sitting here, I could see a group here
25   (indicating), a group here (indicating), and a group

1   here (indicating).

2       Q.    So what we have gone through and the

3   descriptions that you have given, are based on a view

4   that you took looking out and forward, not behind you?

5       A.    Yeah.  It has been a while, but, yeah, when we

6   first got there, they were in front of us.

7       Q.    Okay.  And did you ever move the van during

8   your observation period, or once Officer Harrell had

9   the van in this final resting location before the

10  shooting, was where you had always been parked for the

11  time that you were parked?

12          Does that make sense?

13      A.    No, we were rolling through first and, of

14  course, saw the group.  And when we brought the van to

15  this point (indicating), he alerted "gun," and we

16  exited.  And, you know, everything occurred from then

17  on.

18      Q.    I will ask it again, because I think you

19  answered it.  In other words, you didn't assume a

20  number of stationary resting observation points and

21  kind of work your way down here, you gently rolled --

22      A.    Just kind of creep, creep, creep.

23      Q.    Stopped here (indicating), and that is where

24  the action happened?

25      A.    Pretty much.

1    Q.    And it is your recollection that it happened

2    in front of you?

3    A.    Pretty much everything in front.  It has been

4    a while, though.

5    Q.    And I am asking your perception of why Officer

6    Harrell got out.  I am not asking you to speculate what

7    he thought, but your perception of what he is doing is

8    he -- I understand your testimony, I am just trying to

9    be clear, is that the reason that he got out of the van

10   is because he saw a gun?

11   A.    Yeah.

12   Q.    Did you-all ever talk about getting out of the

13   van before he did get out?

14   A.    No.

15   Q.    So you never made a plan to say, okay, let's

16   get out here and figure out what is going on?

17   A.    No.

18   Q.    And your understanding is, he wasn't getting

19   out and then saw the gun?

20   A.    No.  When he yelled "gun," he obviously saw

21   the gun, as he yelled "gun" and exited the vehicle.

22   Q.    First time you heard the word gun, Officer

23   Harrell is sitting in the driver's seat?

24   A.    As he is getting -- you know, at the same time

25   exiting the vehicle.

1     Q.     Do you know what hand the gun was in?

2     A.     I couldn't tell you.

3     Q.     Certain to say that you never saw the gun --

4     A.     Yeah, I never saw it.

5     Q.     -- until after the shooting?

6     A.     Until after the fact.

7     Q.     Okay.  What does it mean when you said, "zero

8   tolerance" in Ybor?

9     A.     Basically, when we work Ybor, all the SAC

10  squads in Ybor, zero tolerance, whether it be a

11  drinker, a fight, to any kind of crime, we act on it,

12  make an arrest on it, if we can, in Ybor, because it is

13  Ybor, a lot of issues, so we try to curb that by having

14  a zero tolerance for everything.

15    Q.     One way of looking at that, would also be that

16  even if it is a low-level crime, it might take up your

17  time, you don't turn a blind eye to see if there is

18  bigger things going on, you take care of something else

19  when you see it?

20    A.     Oh, yeah.  If it is in front of us, we try to

21  deal with it right then and there.

22    Q.     Has anyone else from your agency or any other

23  agency tried to talk to you about this incident and

24  interview you?

25    A.     No, just you guys -- just besides Ursula

1    telling me I had a depo, and one of your gentlemen

2    served me a subpoena, other than that, no.

3         Q.   Did you know the witness, Kevin Bennett?

4         A.   No.

5         Q.   Do you even know who I am talking about?

6         A.   No.

7              MR. MADDUX:   I don't have any further

8         questions at this time.

9              MS. RICHARDSON:   I don't have any questions.

10                     **CROSS-EXAMINATION**

11   BY MR. J. MAKHOLM:

12        Q.   Officer Myles, John Makholm; I represent

13   Officer Harrell.  I want to clear up a couple of things

14   here on Mr. Maddux questions, that -- back around 10:44

15   this morning, he was asking you if you recalled

16   Vartanian out of the crowd, prior to the shooting.

17        A.   No, it was a group of them.  I couldn't pick

18   him out, you know, of the group --

19        Q.   At the time you were approaching and seeing

20   the crowd in front of you --

21        A.   Uh-huh.

22        Q.   -- did you even know who Vartanian was?

23        A.   No, sir, I couldn't --

24        Q.   Sitting here today, could you say he was or

25   was not in that group, either way?

1      A.    I couldn't tell you, no, sir.

2      Q.    Okay.  Let's go back to driving down the

3   street.  Do you have a picture of that, which is --

4   what is this, 6th (indicating)?

5      A.    6th Avenue.

6      Q.    Did you make the corner by the parking garage,

7   correct?

8      A.    Correct.

9      Q.    You are heading eastbound on 6th?

10     A.    Yes.

11     Q.    You see these two groups of people?

12     A.    Yes, sir.

13     Q.    One group on the north side and one group on

14   the south side?

15     A.    Yes, sir.

16     Q.    Okay.  Mr. Maddux was asking you, if you

17   stopped or you just kept cruising.

18     A.    We kind of crept through.

19     Q.    Isn't it true that you crept past the two

20   groups of people when you finally stopped?

21     A.    I don't remember.

22     Q.    Okay.  Mr. Maddux also asked you to speculate

23   on how this might not have happened.  Do you recall

24   that?

25     A.    Yes, sir.

1      Q.    How about if Mr. Vartanian had not been

2  carrying a gun, do you think this shooting may not have

3  happened?

4           MR. MADDUX:  Objection.  Form.

5           MR. J. MAKHOLM:  I don't have anything else.

6           MS. RICHARDSON:  Still don't have any

7      questions.

8           MR. MADDUX:  All right.  We are done.  I will

9      do read or waive off.

10           (A discussion was held off the record.)

11           THE DEPONENT:  Read.

12

13           (Thereupon, the taking of this deposition was

14      concluded at 11:23 a.m.)

15

16

17

18

19

20

21

22

23

24

25

1   **CERTIFICATE OF OATH**

2   STATE OF FLORIDA

3   COUNTY OF HILLSBOROUGH

4

5   I, KIMBERLY STRASSER, Court Reporter, the undersigned

6   authority, certify that **CESARE MYLES** personally

7   appeared before me and was duly sworn.

8

9   WITNESS my hand and official seal this

10  26th day of June, 2011.

11

12

13

14   _____

15           Kimberly Strasser, Court Reporter
             Notary Public, State of Florida
16            Commission No.:  EE055426
             My Commission Expires:  02/25/2015
17

18

19

20

21

22

23

24

25

**CERTIFICATE OF REPORTER**

STATE OF FLORIDA
COUNTY OF HILLSBOROUGH

I, Kimberly Strasser, Court Reporter, do hereby
certify that I was authorized to and did stenographically
report the deposition of **CESARE MYLES;** that a review
of the transcript was requested; and that the
foregoing transcript is a true and correct record of
my stenographic notes.

I FURTHER CERTIFY that I am not a relative, employee,
or attorney, or counsel of the parties, nor am I a
relative or employee of any of the parties' attorney
or counsel connected with the action, nor am I
financially interested in the action.

DATED this 26th day of June, 2011, at Hillsborough
County, Florida.


_____
Kimberly Strasser, Court Reporter


DO NOT NOTARIZE ANY CERTIFICATE OF REPORTER

ERRATA SHEET

DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES

IN RE: (Vartanian v. Officer Richard Harrell, et al.,
Case# 8:10-cv-01367-SDM-EAJ, Deposition of Cesare
Myles, 01/7/11)

Page        Line          Error or Amendment          Reason

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Under penalties of perjury, I declare that I have read
the foregoing document and that the facts stated in it
are true.


_____
DATE                         CESARE MYLES

```
                      ECHO REPORTING, INC.
                       Post Office Box 527
                  St. Petersburg, Florida 33731

                                   June 27, 2011


URSULA D. RICHARDSON, ESQ.
City Attorney's Office
315 East Kennedy Boulevard, 5th Floor
Tampa, Florida 33602


RE:  Vartanian v. Harrell, et al.

DEPOSITION OF: Cesare Myles
TAKEN: 1/7/11
DATE SENT TO ATTORNEY:_____

 Ms. Richardson,

        The referenced transcript has been completed
and awaits reading and signing.

        Please have Mr. Myles read your copy of the
deposition and sign the errata sheet.


        Thank you.


          _____
           Kim Strasser, Court Reporter
```