# Exhibit "D"

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

JENNIFER VARTANIAN,
as the Personal Representative
of the Estate of Roobik Vartanian,

      **Plaintiff,**

vs.                                  CASE NO.: 8:10-CV-01367-SDM-EAJ

OFFICER RICHARD HARRELL,
Individually; and CITY OF TAMPA, Florida,

      **Defendants.**
_____/

**AFFIDAVIT OF DAVID M. GROSSI, SR.**

STATE OF FLORIDA
COUNTY OF LEE

      BEFORE ME, the undersigned authority personally appeared DAVID M. GROSSI, SR. who, by me being First duly sworn, deposes and says:

This Affidavit is made upon my personal knowledge. I am an honorably retired police lieutenant from upstate New York presently residing in Bonita Springs, Florida. I have served in all capacities of law enforcement; as a patrolman, an undercover narcotics investigator, detective, sergeant, lieutenant and training commander. I have worked in all aspects of police services, including uniform patrol, administrative, investigative, internal affairs, training and command-level positions. During the course of my 20+ years, I have received over 20 awards, commendations and citations including Police Officer of the Year, a Heroism Citation from the Rochester (NY) Chamber of Commerce, three Outstanding Service Citations from the Monroe County (NY) District Attorney's Office for Homicide Investigations, Bombing Investigations and Training, the Special Award of Honor from the International Narcotics Enforcement Officers Association and two Outstanding Excellence in Training Awards from the U.S. Army Law Enforcement Command.

I have been certified in both New York and Florida as a police instructor. I was the first police trainer in the United States to receive the designation of *Certified Law Enforcement Trainer*.

I have taught use of force issues and concepts in every forum of police training including basic academy, in-service courses, instructor-level programs, and at the college level in criminal justice curriculum. Several of the training programs I instructed were conducted within the Tampa, Florida area all of which were certified through the Florida Commission on Criminal Justice Standards and Training.

I have been retained in over 500 cases as a police procedures expert and have previously been accepted and have testified as such in both in the U.S. and abroad in both state and federal courts, including the Circuit Courts for the State of Florida and the U.S. District Courts for the Middle District of Florida. I have trained over 165,000 law enforcement officers across the U.S. and Canada on these issues.

I have authored over 250 professional and peer-reviewed articles and book chapters on numerous topics relating to police use of force, management and supervision and other topics for such prestigious publications as Law Officer, Chief of Police, Law and Order, The Law Enforcement Executive Forum, and The Law Enforcement Trainer magazines.

I hold a Bachelor's degree in Community/Human Resources (with a major in Police Administration) from the State University of New York and am a graduate of the FBI National Academy in Quantico, Virginia.

My professional memberships include the International Association of Chiefs of Police; the FBI National Academy Associates; the FBI Law Enforcement Executive Development Association; the International Association of Law Enforcement Firearms Instructors; and the International Law Enforcement Educators and Trainers Association. I have also guest-lectured and taught at the International Training Conferences for both the American Society of Law Enforcement Trainers and the International Association of Law Enforcement Firearms Instructors.

I currently sit on several national boards including the National Advisory Board of the Force Science Research Center at the Minnesota State University (Mankato) among others and am a past vice-president (firearms) of the National Association of Chiefs of Police. I have previously served as a member of the Executive Board of the American Society of Law Enforcement Trainers and as vice-president for the National Association of Chief's of Police.

I am named in Who's Who in American Law Enforcement Training and my professional memberships include the FBI National Academy Associates, the International Association of Chief's of Police, the International Association of Law Enforcement Firearms Instructors, the International Association of Police Trainers, the International Law Enforcement Educators and Trainers Association and the National Law Enforcement Training Center. My up-to-date curriculum vitae is attached hereto.

I have been asked by the defense in this case to review numerous documents in conjunction with this incident involving the City of Tampa (FL) Police Department, specifically Officer Richard Harrell. Those documents include:

1. The Second Amended Complaint of Ms. Jennifer Vartanian;

2. Two statements of Officer Richard Harrell, one dated September 6, 2008, and a second dated February 12, 2009;

3. Tampa (FL) Police Department scene diagram and legend;

4. State Attorney's Office clearance letter;

5. Tampa (FL) Police Department Incident/Offense Report #2008-539008 including investigative supplements;

6. Color photographs of Officers Richard Harrell and Cesare Myles and their outer vests;

7. Transcribed statements of **Mr. Jeffie Jones, Mr. Phillip Ibrahim, Mr. Frank Maldonado, Mr. Aydin Ravaee, Mr. Edwin Rodriguez, Mr. Kenneth Bennett, Mr. Justin Hall, Mr. Joshua Henry, Ms. Recia Henry** and **Ms. Markeva Kirk**;

9. NCIC, Florida Criminal History Check and D.A.V.I.D histories on Mr. Roobik Vartanian;

10. D.A.V.I.D. history on Ms. Jennifer Vartanian;

11. 9-1-1 radio traffic from September 6, 2008;

12. FDLE firearms and blood analysis form;

13. Autopsy Report on Mr. Roobik Vartanian;

14. Two hundred and eighty (280) color photographs of the scene, Mr. Jones, Mr. Ibrahim, autopsy on Mr. Vartanian, weapons, and surveillance camera stills from the Club Prana;

15. The Tampa (FL) Police Department Internal Affairs Case File (#08R-042);

16. NCIC and Florida Criminal History Checks on Mr. Kenneth Bennett, Mr. Frank Maldonado, Mr. Aydin Ravaee, Mr. Edwin Rodriguez, Mr. Joshua Henry, Mr. Philip Ibrahim, Mr. Jeffie Jones, Ms. Recia Henry, Mr. Justin Hall and Ms. Markeva Kirk;

17. Depositions of the following individuals: **Mr. Kenneth Bennett** and **Ms. Jennifer Vartanian**;

18. Surveillance film from the office and alley of the Club Prana;

19. Two hundred fifty-eight (258) color photographs of the scene, autopsy, principals and weapon (many duplicative from #14);

20. Miscellaneous documents (property records, firearms entry forms, consent to search forms, etc.).

Furthermore, on November 2, 2010, I traveled to Tampa, Florida and conducted a site inspection of the shooting scene of this incident at 1611 East 6th Avenue and the surrounding area, including the Club Prana, 1619 East 7th Avenue; and at that same time, personally interviewed Tampa (FL) Police Officer Richard L. Harrell.

Incident Overview

This incident occurred on September 6, 2008. On this date, two officers of the Tampa (FL) Police Department, Officers Richard Harrell and Cesare Myles, both assigned to the Street Anti-Crime Unit (SAC Unit), were working plainclothes surveillance in an unmarked 2003 Chevrolet Astro Van. They were assigned to the Ybor City area of Tampa. Their duties included observing suspicious activity, running vehicle plate numbers for stolen and other proactive-type law enforcement duties.

At approximately 1:15 AM, while traveling eastbound on East 6th Avenue between North 16th and North 17th Streets, they observed and heard what appeared to be a verbal disturbance/altercation between two groups of males; a group of three white males on one side of East 6th Avenue yelling at two black males standing next to a dark SUV on the other side of the street.

Both officers decided to stop after passing the group. They parked and observed the two groups for a few minutes to see what, if anything was going to transpire that might necessitate police intervention. The three white males appeared to be the aggressors; as the two black males appeared to be retreating from the trio who were last seen running across East 6th Avenue. After a few seconds, it appeared that some verbal threats were being directed by the three white males to the two black males which resulted in some verbal responses by them.

Suddenly, Officer Harrell's attention was directed to a fourth large white male who entered the scene from the north crossing a set of east-west railroad tracks. This fourth white male was observed running toward the other three white males. He also appeared to be a holding a handgun. However, during his slow run across the railroad tracks that parallel East 6th Avenue, he was seen jogging past the officers toward the two black males. Upon viewing this activity, Officer Harrell alerted his partner to the presence of this new threat by yelling "Gun!" He then exited the van and drew his own handgun. This fourth white male, a subject later identified as Mr. Roobik Vartanian, age 35, was carrying the gun in what Officer Harrell described as a two-handed "low-ready" position, pointed in somewhat of a downward fashion in the direction of the two black males.

As Mr. Vartanian ran toward the black males, Officer Harrell heard him yell, "I'm going to kill that mother fucker" followed by "I'm going to shoot that nigger." Upon viewing this threatening conduct Officer Harrell identified himself by first yelling "Police" and then "drop your weapon!" Receiving no response or reaction, he again yelled "Police, drop your weapon!" During this second command, Mr. Vartanian turned toward Officer Harrell, looked at him with what the officer described as a "very aggressive" and "angry" look on his face, and now holding the gun in one hand, turned to his left and pointed the

Page 4 of 11

firearm at the officer. Upon observing this immediate deadly threat, Officer Harrell fired one round from his handgun to stop Mr. Vartanian striking him in the chest area.

Mr. Vartanian and the firearm he was holding fell to the ground. Officer Harrell ran up to him, positioned himself between the gun and the subject and yelled "Don't move!" He then holstered his handgun, radioed in "shots fired" and requested EMS.

Shortly after doing so, the three white males, reportedly bouncers at the Club Prana, became aggressive toward Officer Harrell saying he just shot one of "their boys." He then drew his gun again, detaining the three now very angry witnesses until back up arrived. This new potential threat prevented the officer from beginning any type of emergency first aid to Mr. Vartanian.

Mr. Roobik Vartanian was eventually transported to Tampa General Hospital where he expired from his one gunshot wound. His estate, as represented by Ms. Jennifer Vartanian, is the plaintiff in this civil action.

The after-action investigation revealed that Mr. Vartanian, employed by the Club Prana as either a volunteer bouncer, the bar manager or the assistant manager, was given the Taurus semiautomatic pistol at the Club Prana by an employee, Mr. Kenneth Bennett, after an alleged threat made to him by an individual ejected moments earlier from the Club Prana by the security team. A BATF (Bureau of Alcohol, Tobacco and Firearms) trace confirmed the Taurus used by Mr. Vartanian belonged to Mr. Bennett and was purchased by him in April of 2007.

This shooting was reviewed in several forums. First, the Hillsborough County State Attorney's Office reviewed the matter and in a letter dated September 29, 2008; indicated that in their opinion, the use of deadly force by Officer Harrell was justified and within state statutes.

The Tampa (FL) Police Department also conducted an internal administrative investigation and after a six-month investigation which included interviewing numerous witnesses and examining all the available evidence, concluded there were no violations of department policy regarding Officer Harrell's use of deadly force.

Witness statements

The witness statements tend to support the officer's version of the events. For example, Mr. Kenneth Bennett, an employee of the Club Prana and the owner of the Taurus .40 S&W caliber pistol carried by Mr. Vartanian, advised investigators that he heard one of the officers give a loud verbal command to Mr. Vartanian to "freeze, drop your weapon" or "gun, drop your weapon" before that officer fired. He further stated that he saw Mr. Vartanian make a turning-type movement before the officer fired.

Officer Cesare Myles, the partner of Officer Harrell, during his statement to the CID investigators indicated that he heard his partner yell, "gun", then "police, drop your weapon" prior to hearing the shot go off. He witnessed Mr. Vartanian fall to the ground.

Mr. Jeffie Jones, one of the two black males removed from the Club Prana, admitted to investigators that he recognized both Officer Harrell and Officer Myles as police officers by their clothing.

Mr. Phillip Ibrahim, the other black male ejected from the Club Prana, also testified that he knew the two officers were "undercover police" and that he heard "police, don't move."

Mr. Frank Maldonado, General Manager of the Club Prana, also testified that he heard one of the officers yell "stop" a second before he heard the shot.

Mr. Kenneth Bennett, a security guard at the Club Prana, after initially testifying that Mr. Vartanian took his gun from him without his permission, changed his story after being confronted by video tape evidence and admitted during his sworn deposition of December 15, 2010, that he gave his loaded Taurus semiautomatic pistol to Mr. Vartanian at the insistence of his security manager, Mr. Ravaee.

Mr. Aydin Ravaee, Security Manager of the Club Prana, stated that Mr. Vartanian did have the Taurus semiautomatic pistol owned by Mr. Kenneth Bennett in his hand when he left the bar. He described the gun very accurately, i.e., blue steel with silver on the top. He also heard one officer yell "freeze" before the shot was fired. He stated he recognized the two officers by their vests.

Mr. Edwin Rodriguez testified that Mr. Vartanian had a gun in his right hand as he left the club in pursuit of Mr. Ibrahim and Mr. Jones. He heard one of the officers yell "stop." He also testified that he recognized the officers by their vests.

Mr. Joshua Henry, another employee of the Club Prana also testified that he recognized the driver of the van, Officer Harrell, as a police officer as he "had the police vest on."

Physical evidence

Spent bullet casings are not always an accurate indicator of where an officer was positioned when he fired his firearm due to many external factors. Most often, during the dynamics of the event, both the officer and suspect are moving and the weapon is usually canted sideways or not held perfectly perpendicular to the ground. Furthermore, the arrival and deployment of responding EMS personnel may disturb ejected casings. However, the Tampa (FL) Police Department Crime Scene Unit diagram and legend places Officer Harrell's spent 9mm casing slightly off the rear driver's side bumper of the police van. Glock semiautomatic pistols generally have a right/rear ejection mode. Based on the final resting place of Officer Harrell's spent casing, coupled with the numerous witness statements and the apparent blood stains from Mr. Vartanian, Officer Harrell's recollection of the events appear to be corroborated by the physical evidence.

The autopsy report and accompanying photographs also tend to support the officer's version of the events. Specifically, Medical Examiner Dr. Jacqueline Lee, M.D. records the one bullet wound to the left chest area of Mr. Vartanian to have a front-to-back, left-to-right trajectory. This tends to corroborate Officer Harrell's perceptions of Mr. Vartanian turning left toward him when he fired his one round.

### Background

**Officer Richard L. Harrell,** age 39 on September 6, 2008, had been with the Tampa (FL) Police Department for approximately 6-1/2 years. He had prior law enforcement experience with both the Seminole County (FL) and Orange County (FL) Florida Sheriff's Offices for a combined 12 years. On this date, he was working in a plainclothes capacity assigned to the Street Anti-Crime (SAC) Unit.

He was working with a plainclothes partner, Officer Cesare Myles. Both officers, while dressed in civilian clothing, were wearing department-issued dark blue vests as their outer garments which identified them by both an embroidered Tampa police patch with POLICE on the front and POLICE in larger yellow letters on the back. In addition, their badges were displayed on chains around their necks.

**Mr. Roobik Vartanian** was 35 years old on the date of this incident. He stood approximately 6'3" tall and weighed in the vicinity of 215 pounds. He had a lengthy criminal record dating back to 1995 for such crimes as Aggravated Assault with a Weapon, Grand Theft Auto, Drug Trafficking and Possession, and Disorderly Conduct. On the date of this incident, depending on who was asked, Mr. Vartanian was an unpaid "volunteer" bouncer, the bar manager or the assistant club manager of the Club Prana located at 1619 East 7th Avenue in Tampa. He was not licensed to possess a firearm.

### Weapons

**Officer Richard L. Harrell,** as a member of the Street Anti-Crime (SAC) Unit, he was carrying his personally-owned, department-authorized Glock 19, 9mm semiautomatic pistol (Serial #EUW207US), loaded with department-issued Winchester 9mm ammunition. He last trained and qualified with this firearm on March 13, 2008, just six (6) months prior to this incident and earned a ranking of Master Shooter. This weapon was function tested after the incident and found to be working properly.

**Mr. Roobik Vartanian** was armed with a Taurus .40 S&W caliber semiautomatic pistol, Model PT24-7 (Serial #SZK49180), black polymer with a silver stainless steel slide, loaded with 10 rounds of Winchester .40 S&W caliber ammunition, 9 in the magazine and 1 in the chamber. It was function tested after the shooting and was found to be fully operational. Mr. Vartanian did not have a Carry Permit to possess this weapon, which was traced back to Mr. Kenneth Bennett, a security guard at the Club Prana.

### **Opinion**

**The use of deadly force by Officer Harrell was proper and reasonable.** The use of force by today's police officers is measured and evaluated via a standard Use of Force (or Control) Continuum. Force continua describe the gradations of force that police officers may use based on the level of resistance from suspects they are in the process of arresting or controlling. Most standard continua consist of six levels and ranges from *Presence, Verbal Direction, Passive Physical Resistance, Active Physical Resistance, Aggressive*

*Physical Resistance* and *Aggravated Physical Resistance* and outline the appropriate levels of force officers may use to overcome each level of resistance.

Level 6 resistance is *Aggravated Physical Resistance*, which is generally described as "overt, hostile, attacking movements with or without a weapon with the intent and apparent ability to cause death or great bodily harm to the officer or to other persons."

Aggravated physical resistance would justify the use of Level 6 response measures, to wit: deadly force. From my review of the material provided, it was reasonable for Officer Harrell, when he observed Mr. Vartanian point what he recognized to be a firearm at him, to believe that a deadly threat may be imminent.

From my review of the material it appears that Officer Harrell issued two clear, loud and concise verbal commands for Mr. Vartanian to drop his weapon. However, Mr. Vartanian, for some unknown reason, turned and pointed his gun at Officer Harrell. At that point, the threat to Officer Harrell became *immediate* and the need to defend himself *necessary*.

Police officers are universally trained that "action" will always beat "reaction" and that a subject holding a gun in his hand can pull the trigger of that handgun in under ¼ second (0.25 second). In other words, officers are trained that they do not have to wait until an armed suspect shoots at them before they are permitted to defend themselves. As such, it was reasonable for Officer Harrell to perceive Mr. Roobik Vartanian's fully functional firearm (which was pointed in his direction) as an overt, hostile and attacking movement.

When one considers that Officer Harrell was out in the open, without benefit of cover and facing an armed subject who has, by all accounts, ignored his two commands to put the gun down, it would be reasonable for him to perceive the suspect's turning and pointing the weapon at him as an immediate threat; and in my opinion, such conduct, from a police training standpoint, would justify the use of deadly force as a proper and reasonable response.

All legitimate police firearms trainers and force practitioners recognize that the action/reaction concept consists of three separate but interrelated psychomotor skills: *perception time, response time* and *reaction time*. Perception time is that time (approximately ¼ (0.25) of a second) it takes a reasonably trained officer to visually recognize an action and perceive it as a deadly threat. This is then followed by the time it takes to determine what *response* action to take, a lag time of an additional ¼ (0.25) of a second based on the officer's skills and level of training.

The third component is *reaction time*, or that time it physically takes for the officer to complete the actual movement needed to stop the threat, i.e., bring the firearm up to eye level, visually check for a safe backdrop, align the front and rear sights and pull the trigger. This is the longest component of the three and can take between 4/10 of a second up to 8/10 of a second or more.

This total accumulation of time can add up to over a full second under optimum conditions. When one adds in the element of movement and/or darkness it might take an

Page 8 of 11

officer upwards of 2 seconds to (1) *perceive* an armed suspect turning and pointing the weapon in his direction, (2) *make the decision* to respond with deadly force, (3) *line up one or both of an officer's sights* (front and/or rear), (4) *visually check* for a safe back drop (5) and *pull the trigger*. In contrast to that, a suspect with a gun already in his hand can fire his weapon or move it slightly in under 1/4 of a second.

All the physical evidence points to the fact that Mr. Roobik Vartanian was armed with a fully-functional loaded firearm at the time Officer Harrell fired his weapon. This weapon, constructed of blue steel and black polymer was manufactured with a brushed silver-colored stainless steel slide making it readily visible, noticeable and recognizable as a firearm.

It is my expert opinion as a veteran police command officer and trained and certified firearms instructor, and within a reasonable degree of law enforcement certainty based on the totality of the circumstances, that the actions and conduct of Tampa (FL) Police Officer Richard Harrell on September 6, 2008, were proper, justified, objectively reasonable and well within the nationally accepted standards of the law enforcement training industry and consistent with the policies and procedures of the City of Tampa (FL) Police Department regarding the use of deadly force.

He was wearing a police-issued dark blue vest with POLICE emblazoned on both the front and the back, a Tampa police patch on the front and his badge of authority displayed on his chest. Two verbal warnings (Police! Drop the weapon!) were given, and ignored. From the distances involved empty-hand control techniques, baton and/or chemical agents were not possible nor are they appropriate against a firearm threat. Officer Harrell had a split second to make his decision. He could stand his ground without benefit of cover and see if this armed subject would shoot him or he could fire in self-defense. In my opinion, Officer Harrell's use of deadly force to stop this immediate deadly threat was the only option available to him.

## Summary

The actions and conduct of Tampa (FL) Police Department Officer Richard Harrell were well within the guidelines of his training as articulated in the two U.S. Supreme Court decisions, *Tennessee v. Garner* and *Graham v. Connor*. Under the parameters of *Tennessee v. Garner*, officers are taught that deadly force may be used against an individual only if that suspect poses an immediate threat to that officer or someone else.

Under the parameters of *Graham v. Connor*, they are taught that their force must be objectively reasonable. Given the severity of the threat involved (facing an armed suspect), the fact that the suspect posed an immediate threat to the officer (by bringing the gun to a shooting position) and showed no intention of complying with his verbal orders/commands to drop the gun (active resistance), it is my opinion that the conduct of Officer Harrell was proper and objectively reasonable from a deadly force standpoint.

I am prepared to testify to all of the above under oath should the need arise.

I would respectfully reserve the right to augment or amend this affidavit if additional documents or material are provided for review.

Attached hereto **as Exhibit "A"** and made a part hereof in addition to my up-to-date curriculum vitae, please find my current fee schedule, copy of check stub #00533076 for $4,000 reflecting my retainer for initial review, and a second invoice for $3,328.92 dated March 16, 2011, for additional work performed and preparation of my expert report. I have also enclosed a separate notification of all cases where I have given testimony in either deposition or trial within the last four years.

Let me list the published documents and written material that I used to assist me in formulating my opinions. Some of the foregoing may also serve as potential exhibits to summarize or support my opinions at trial. Please bear in mind, this list is not intended to be all inclusive, for much of the information was gained collectively through over 7,500 hours of professional training, formal education and over 20 years of sworn full-time, professional police experience in patrol, investigative, administrative, training and tactical command management positions up through the ranks.

References

Adams, Ronald J., Thomas McTernan, and Charles Remsberg,
Street Survival: Tactics for Armed Encounters (Northbrook, IL:
Calibre Press, Inc. 1981).

Force Continuum and Definitions, Calibre Press, Inc. (1985).

Geller, William A. and Michael S. Scott, Deadly Force: What We Know,
(Washington, DC:, Police Executive Research Forum, 1992).

Grossi, Dave and Bill Lewinski, Ph.D., *"The Suspect Is Shot In the Back.
Is Your Shooting Clean?"* The Police Marksman, September/October, 1999.

Grossi, Dave, *"Remembering the 'Reactionary Gap'"*, The
Law Enforcement Trainer, March/April, 2004.

Lewinski, Bill, Ph.D., *"Why Is The Suspect Shot In The Back?"*
The Police Marksman, November/December, 2000.

Matulia, Kenneth, J., A Balance of Forces: Model Deadly Force
Policy and Procedure, (Gaithersburg, MD: International Association
of Chiefs of Police, 1985).

Remsberg, Charles, The Tactical Edge: Surviving High Risk Patrol,
(Northbrook, IL: Calibre Press, Inc. 1986).

Further Affiant sayeth not.

_David M Grossi, Sr._
**David M. Grossi, Sr.**

STATE OF FLORIDA
COUNTY OF LEE

  BEFORE ME personally appeared **David M. Grossi, Sr.** to me well known and known to me to be the person described in and who executed the foregoing instrument, and who did take an Oath, and swears that the foregoing is true and correct.

  WITNESS my hand and official seal, this 28th day of June, 2011.

_Anne M Phillips_
NOTARY PUBLIC

Anne M. Phillips
My Commission Expires: 10/16/2013

RECEIVED
JUN 29 2011
BY: _____