# Exhibit "D"

# The Tactical Edge

## Surviving High-Risk Patrol

by
**CHARLES REMSBERG**
author of STREET SURVIVAL:
Tactics for Armed Encounters

photography and design by **DENNIS ANDERSON**

"May do" tactics are also practical and effective. Some recently refined ones, in fact, are far superior to old-fashioned brutal tricks in terms of fast, reliable control. They are not necessarily "soft." Some are "hard" enough in terms of impact to cause severe injury to a suspect. But if you apply them correctly under the proper circumstances, they are *court defensible*. In other words, they work on the street *and* in court. That's why, as an officer operating in the current social and judicial climate, you "may" use them as force resources.

About 75% of the time, assaults on law enforcement personnel are by *unarmed* assailants. More often than not, you'll be expected to respond with unarmed force of your own. All things being equal, physical encounters are won by the bigger, stronger participant. As an officer who will not always be superior in stature, you can't live with that. Physical control tactics are what you can use in many situations to make up the difference—to make the confrontation *unequal* in your favor and to help you do what you otherwise might not be able to.

The focus that follows is on some of the latest, fastest "may do" techniques, which give you maximum control through minimum effort...and on the tactical and legal framework into which they fit. The techniques pertain to *physical* control, the force option concentrated on here. Control through the use of deadly force from firearms is referenced in previous chapters and is developed in detail in the *Street Survival* book.

Keep in mind that the techniques described here are best learned through structured, *hands-on* training, conducted by persons certified in the skills they are instructing. You should gain experience through more than just static, stationary training. Learn the basic moves "by the numbers" with that. Polish them with "fluid" training, where you improve speed, form and precision. Then continue beyond into street simulations, where you learn to apply these techniques with full speed and power under stressful, varied, realistic circumstances. If you live where there's cold weather, be sure to practice in full winter clothing, too. Reinforce everything with mental exercises of Crisis Rehearsal.

## The Force Continuum

On patrol, you need to be a "confrontational generalist." You are not permitted just one or two specialized responses for any time a subject resists your attempt to enforce the law or physically assaults you. You cannot, for instance, automatically *shoot* everyone who fails to comply with what you want them to do. Resistance and attack come in *many* forms, with varying degrees of intensity and at different levels of threat to you. And you're expected to tailor your reaction from a *range* of options so it is *adequate* to stop the suspect's hostile behavior and establish your ability to command and direct him...but no more.

With the right training and experience, you can suitably manage *whatever* action the suspect presents, selecting from among tactics that range from your mere presence to center-mass gunfire. In a sense, *he* decides what he wants from you and justifies a certain level of force in the way he behaves. You deliver just enough force to accommodate his decision. He may be *violent;* you must *only* be *forceful*. Violence connotes a loss of control, whereas *force* implies a *conscious decision* and a *controlled action* to direct a person. Contrary to how it seems some-

429

their actions. If a few snap phrases ("I feared for my life") don't prove persuasive, they're lost.

To select effective force options in a physical encounter and be able to *justify them later as reasonable*, you must weigh many variables. Unfortunately, you cannot evaluate these according to any rigid formula. They are subject to different interpretations with each encounter. Sometimes their relative influence changes even *during* an encounter. What's appropriate for a given officer against a given offender in a given set of circumstances can be totally *inappropriate* when the players and the setup are changed.

Included in the factors that are important for you to evaluate are your:
- age
- size, and
- sex

—plus the age, size and sex of the *offender*. How you *compare* to the offender in these areas and what that implies may be important in determining the level of force that's appropriate to use in controlling him. All other things being equal, if you're a young, 6-foot, 210-pound male trying to subdue a combative, unarmed, short, middle-aged woman weighing 105 pounds, you'll likely be able to justify using less force than the 120-pound female officer in Illinois who recently was attacked by a 206-pound weightlifter wielding a steel bar. A judge and jury would normally regard her risk of suffering serious harm (broken bones, gaping wounds, damage to internal organs) as being much greater (in fact, she did suffer a concussion, a broken collar bone, a split lip, two black eyes and multiple bruises.) Therefore, her using greater force is easier to accept as being reasonable; higher risk permits higher force.

On the other hand, officers in the real world often are attacked and seriously injured by people *smaller* than they are. Say you're a male officer trying to subdue an older, smaller female whose exceptional fury and adrenalized strength have already permitted her to overpower other officers. You can justify more powerful force than might normally seem reasonable because of *special circumstances*. But where special circumstances require something more than "normal" force, be ready to *identify* them—not only to yourself so you can make better force decisions, but to those who may later evaluate your actions legally to see if they were "appropriate."

Special circumstances that can influence your force choices and their "reasonableness" include:

- **the suspect's skill level** (does he show evidence of knowing martial arts, for instance? Or is he a professional combatant, like the two heavyweight wrestlers who took on some 15 municipal, county and state officers in a suburban motel room, broke one deputy's leg and knocked out several of his teeth and repeatedly slammed his female partner against a wall, fractured her skull, broke seven of her teeth, knocked her unconscious with a knee drop and left her with a permanent loss of feeling in most of her face—before finally being stopped by threat of gunfire?);
- **your training** (are you competent in the most appropriate technique?);
- **your prior knowledge about the offender** (does he have a reputation or history of attacking and beating officers? One West Coast deputy who

431

stopped a motorcyclist for a seemingly routine violation wisely handcuffed him immediately for better control when he recognized him as one of a trio who had been relieved of two knives, a revolver, five rifles, more than 400 rounds of ammunition and a throwing star during another arrest 10 days earlier);

• **the suspect's ability to rapidly escalate his force** (is he near a firearm; either yours or some other one?);

• **your physical condition** (are you injured or near exhaustion from having struggled with him?);

• **your physical position** (are you on the ground...or closed off from an escape route?);

• **your perceptions** (federal agents thoroughly creamed an offender who pointed a gun at a presidential candidate along a rope line. That the "weapon" later proved to be a harmless squirt gun was deemed immaterial because they logically *perceived* it as real when they took action);

• **the surrounding environment** (are there other people nearby who are sympathetic to the suspect and who seem inclined to interfere against you?)

Where these factors tend to increase your jeopardy and make control more difficult, you are justified in increasing your force beyond what might otherwise be regarded as appropriate. Just be prepared later to *anchor your actions to relevant FACTS* about yourself, the suspect and the circumstances to confirm that what you did was *reasonable*. By evaluating the situation you face against this checklist, rather than just knee-jerking to turbo-charged emotions, both your force decisions and your explanations of them will be sounder.

With all these variables to consider, your mental computer has to quickly process a *lot* of information to keep you from underreacting (an important survival consideration) or overreacting (which impacts court defensibility). In high stress, your mind may be groping desperately for what to do--unless you have a practical *framework* that can help you organize your options.

One useful approach is to think of force as a flexible *continuum*, on which the various means of exerting control are positioned.

Building up from bottom to top, each mode represents force of greater intensity. That is, the continuum moves from those options that are *most reversible* to those that are *least reversible*...from those offering the *least certainty of control* to the *greatest certainty*...and from those with the *least expectancy for tissue damage* to the *greatest*. Thus as you go up the scale, you need greater justification.

*Within* each of these broad categories there are also identifiable, escalating gradations of intensity.\* These indicate that even within a given type of response, you have options of lesser or greater force. (Unfamiliar terms used below are explained later in this chapter.)

---

\*Some officers view the baton more as a leverage tool than as an impact weapon. Used as such, it would rank in this Force Continuum with pain/pressure compliance. Likewise, a mini-baton could fall into several categories, depending on how it is used. The designers of this force scale have omitted chemical agents, arguing that those available in aerosol canisters for duty use generally are too limited in application to be ranked. Also omitted are electronic stunning devices, on grounds that more medical testing regarding their safety is needed to place them precisely in the force spectrum. The use of K-9 has also been omitted because of special applications involving dogs and handler training which do not involve the average officer on patrol.

432



By understanding the relative force behind your various control options and also by knowing how they potentially affect an adversary, you are better equipped to select the one(s) best suited to the physical resistance that you face. And if you have *confidence and skill* in the verbal and physical components of the Force Continuum, you will be less likely to resort to your firearm prematurely.

Confronting a suspect who's trying to crush your skull, of course you do not actually have to progress step by step up the force ladder until you hit on something that stops him. Juries strongly prefer that you *talk* first and use force only if your verbal skills fail. Chances are you will say *something*, if nothing more than "*Stop!*" But with any subject, you can

*mentally* run through the full Force Continuum in about a quarter-second and choose what seems most likely to work relative to the threat he presents. If your maneuver fails or circumstances change, you can escalate your force on the basis of a new conscious decision, rather than from fear or anger. This option-evaluation approach helps keep your decision *tactical*.

In court, you then have a framework to hang your hat on. You can cite the Force Continuum...point out where the procedure you used ranks relative to others in intensity...describe your relative strengths in the encounter versus those of the suspect...and then explain why, based on your training and experience, you considered the option you chose to be the *minimum* force you could use to control the confrontation. In other words, you explain why less forceful options would not have worked—or actually did not work—in that situation.

With this kind of *structure* to refer to, you take a lot of vagueness out of your testimony, you sound more professional and you give the jurors a framework for judgment that they, too, can understand.

A growing number of departments are incorporating the Force Continuum into their use-of-force policies. One in Wisconsin has begun coding officers' reports according to the Continuum's various segments. A computer can then analyze all of an officer's physical encounters and determine how frequently he uses each type of force. With this system, if an offender you've severely injured accuses you of habitually resorting to excessive force, the data will readily document what your *true* pattern is.

Keep in mind that while the Force Continuum can be a valuable tool *for* you, it can also be used *against* you. As police performance standards are raised, you will increasingly be expected to apply it to physical control situations—and *to be competent in the various force options it reflects*.

## *Yes/Maybe/No People*

Some officers walk into a bar brawl, and the action stops cold. Others seem always to end up in a fight, even when the subject they're handling is initially nonviolent, the prototype white-haired grandmother who has run a stop sign. It's estimated that just 10% of officers are involved in 90% of the instances of physical resistance or assault, as well as with 90% of the complaints alleging excessive use of force. During any of your shifts, you have multiple contacts where physical conflict is *possible*—conducting field interrogations, issuing citations and making arrests, controlling crowds, breaking up disturbances, rescuing would-be suicides, handling social protesters. Whether resistance and/or assault actually *result* has to do not only with the nature of subjects you confront but also in large part with how they read you...how you read them...and how you use the signals you pick up.

Basically, people you deal with fall into three categories:

**YES PEOPLE** are *cooperative*. You can get them to do what you want by *words alone*. If you must arrest them, they can be handcuffed in a voluntary *free-standing* position. In color code terms, you're in Condition *Yellow* dealing with them.

**MAYBE PEOPLE** are *undecided*. They may comply because they're not sure whether you have the upper hand, but they're likely to be "*passively uncooperative*:" moving slowly in response to your direc-

tions, looking around for an avenue of flight, asking you to repeat instructions or asking a lot of procedural questions, maybe even tentatively pulling away a time or two. In short, they *frustrate the process* while trying to make up their mind what they really want to do. You'll probably need *some level of physical force* with them. Handcuffing with aid of a *wrist lock*, at least. With them, you stay in Condition *Orange*.

**NO PEOPLE** are *actively uncooperative*. They may *run* from you, repeatedly *jerk away* when you try to control them or *violently flail*, swing, kick, bite, scratch, spit or otherwise *assault* you. Your goal is not to spar with them, but to get them *on the ground* as quickly as possible for handcuffing. You're in Condition *Red* with them.





Examples of Yes/Maybe/No People. (upper left) Drug dealer captured in a motel room during a multi-million dollar cocaine bust (Yes person). (above) Man reacts to being maced by holding his ground for a moment (Maybe person). (left) A terrorist sympathizer gives a fight before entering a jail bus (No person).

Obviously, you're safer if you can avoid a physical contest; it's usually easier to *stay* out of trouble than to *get* out after you're in it. Thus you want to keep suspects from escalating into a higher-force category. In other words, you want to convert a Maybe subject into a Yes subject, rather than allowing him to explode into the No mode. And you want to *stabilize* a Yes subject at the level he's at. Some suspects you will *have* to deal with physically; that's the only thing they'll accept from you. But a

435

# A BALANCE OF FORCES

(Second Edition)

## Model Deadly Force Policy and Procedure

By
Kenneth J. Matulia
For
The International Association of Chiefs of Police

copyright © 1985 by the
International Association of Chiefs of Police
Thirteen Firstfield Road — Post Office Box 6010
Gaithersburg, Maryland 20878

# CHAPTER VII.
# POLICE USE OF DEADLY FORCE NATIONAL AND INTERNATIONAL STANDARDS

A statement often heard throughout the early stages of this research was that police agencies nationwide are operating without the benefit of firearms use policy. And, in light of such absence, unnecessary deaths result that impact disproportionately upon the minority community[1] and place an undue burden of responsibility upon the individual police officer at the level of execution. Others have argued that the police executive is without authority to issue policy in such important and sensitive matters that should only be controlled by law.[2] Others hold the position that the street officer must be alone in his decision of when to shoot and when not to shoot, for only he faces the consequences of his decision.[3] There are also many who contend that because the public expects police to take certain risks, that same public will never develop laws which will take use of deadly force discretion away from the police.

As detailed elsewhere in this report, the state legislatures have not come to grips in developing a "model" nationwide law. We are now familiar with the Model Penal Code recommended by the American Law Institute. We are also aware that only two states have adopted this model. Other states rely on a "Common Law" philosophy, a "Modified Common Law" guide, and others depend on the courts to set the standard. This is only a beginning of examples of the prolificacy of "national" standards of deadly force policy. Historically, we shall cite a few of the most significant remaining guides or model standards offered over the years by well-meaning persons or organizations.

## Federal Bureau of Investigation — Policy

Probably the single most espoused cure-all for controlling police use of deadly force has been simply to adopt the first part of the Federal Bureau of Investigation "policy on shooting."[4]

In response to this cure-all solution, one must consider the difference in job responsibilities of the FBI and municipal law enforcement agencies. The FBI is an investigative body that routinely responds to crime "after the fact:" whereas municipal police normally respond to many violent crimes in progress. Thus, the threat level of the agents versus municipal police officers is considerably different. Table 7.1 is used here as an illustration of danger to municipal law enforcement officers. As Margarita[5] found in New York City, police are more likely to be killed by a rational robber fleeing the scene of the crime, who routinely uses lethal weapons. FBI agents are indeed not police, but investigators. Agents are forewarned about situations or persons they intend to arrest. They usually know a great deal about their suspect, whether he is prone to be armed, whether he should be considered dangerous or prone to shoot it out. Agents generally have time to prepare for their arrests. One can easily conclude that the solution to deadly force policy in municipal law enforcement is considerably more complex than simply "adopting the FBI policy."

57

**TABLE 7.1**
**SITUATIONS IN WHICH LAW ENFORCEMENT OFFICERS WERE KILLED***
**1970-1979**

| Number | Percent | Cause |
|---|---|---|
| 244 | 21.3 | Attempting "other" arrests |
| 208 | 18.2 | Robberies in progress |
| 181 | 15.8 | Responding to disturbance calls |
| 144 | 12.6 | Traffic pursuits and stops |
| 92 | 8.0 | Investigating suspicious persons/ circumstances |
| 73 | 6.4 | Burglaries in progress |
| 62 | 5.4 | Ambush entrapment |
| 52 | 4.5 | Handling, transporting prisoners |
| 50 | 4.4 | Unprovoked ambush |
| 32 | 2.8 | Handling mentally deranged persons |
| 5 | 0.4 | Civil disorders |

*FBI, *Crime in the United States, 1979* (Washington, D.C.: U.S. Department of Justice, 1980), p. 310.

## International Association of Chiefs of Police — Policy

In 1940, the IACP issued the following guidelines for police policy on use of deadly force:

> The use of firearms must of necessity be restricted in our cities; otherwise, there will be fatal shootings. The fact that a suspected person is running away from the police and fails to halt when called upon to do so does not justify the police officer in shooting him. There must be some reliable evidence that the fleeing person is guilty of some very serious crime before a police officer is justified in firing at him. Far better to let him escape for the time being than to run the risk of killing him or, worse still, killing some innocent person.[6]

Since the late 1960's, the IACP has recommended the following "Discharge of Firearms" General Order:[7]

> Members shall exhaust every other means of apprehension before resorting to the use of firearms.
>
> Firearms may be discharged in the performance of a police duty only under the following circumstances:
>
> 1. At an approved range.
> 2. When killing seriously wounded or dangerous animals where other disposition is impractical.
> 3. When necessary in the defense of their own lives when all other available means have failed.
> 4. When necessary in the defense of another person's life when all other available means have failed.
> 5. When necessary to effect the capture of, or prevent the escape or rescue of, a person whom the member has reasonable cause to believe has committed a felony, except for felony violations of the Motor Vehicle Code, when all other available means have failed.

58

Firearms shall not be discharged under the following circumstances:

1. As a warning
2. At moving or fleeing vehicles involved in violation of the Motor Vehicle Code (including felony violations) unless necessary in the defense of the member's life when all other reasonable means have failed.
3. In all misdemeanor cases.

In 1980, the members of the International Association of Chiefs of Police voted to adopt the following standard for police use of deadly force:[8]

> WHEREAS, it is the sworn duty of police and other law enforcement agencies to uphold the constitution of their respective countries, and to protect the life, safety and general welfare of the public; and
>
> WHEREAS, the members of the IACP hold that human life is precious, and
>
> WHEREAS, the membership is vitally concerned that all police protect the citizens of their jurisdiction from injury or death, now therefore be it
>
> RESOLVED that it is the position of the IACP that law enforcement officers shall not use unnecessary physical or deadly force in any circumstances; and be it further
>
> RESOLVED that police or law enforcement officers use deadly force only where an officer has reasonable belief to fear for his or another's life or safety, and/or in cases consistent with laws applying within their jurisdiction, be it further
>
> RESOLVED that the IACP membership recommends to the several state legislatures, the U.S. Congress and the governing bodies of the 62 free member countries of the world that they provide funds to continue training officers in the proper use of physical and deadly force, and recommend that police administrators develop rules and regulations, consistent with their jurisdictional law, to protect all citizens from any unnecessary use of physical or deadly force; and be it further
>
> RESOLVED that police departments record, investigate and take appropriate action to insure that these guidelines are carried out; and be if further . . .

## American Law Institute

In 1962, the American Law Institute proposed a "Model Penal Code"[9] that included the following section on policy for use of deadly force in law enforcement:

> The use of deadly force is not justifiable under this section unless:
>
> (1) The arrest is for a felony; and
> (2) The person effecting the arrest is authorized to act as a peace officer or is assisting a person whom he believes to be authorized to act as a peace officer; and
> (3) The actor believes that the force employed creates no substantial risk of injury to innocent persons; and
> (4) The actor believes that: the crime for which the arrest is made involved conduct including the use or threatened use of deadly force; or there is a substantial risk that the person to be arrested will cause death or serious bodily harm if his apprehension is delayed . . .

## The President's Commission

In 1967, a report by The President's Commission on Law Enforcement and Administration of Justice[10] recommended that police agencies adopt the following use of deadly force guidelines:

> 1. Deadly force should be restricted to the apprehension of perpetrators who, in the course of their crime, threatened the use of deadly force, or if the officer believes there is a substantial risk that the person whose arrest is sought will cause death or serious bodily harm if his apprehension is delayed. The use of

firearms should be flatly prohibited in the apprehension of misdemeanants, since the value of human life far outweighs the gravity of a misdemeanor.

2. Deadly force should never be used on mere suspicion that a crime, no matter how serious, was committed or that the person being pursued committed the crime. An officer should either have witnessed the crime or should have sufficient information to know, as a virtual certainty, that the suspect committed an offense for which the use of deadly force is permissible.
3. Officers should not be permitted to fire at felony suspects when lesser force could be used; when the officer believes that the suspect can be apprehended reasonably soon thereafter without the use of deadly force; or when there is any substantial danger to innocent bystanders. Although the requirement of using lesser force, when possible, is a legal rule, the other limitations are based on sound public policy. To risk the life of innocent persons for the purpose of apprehending a felon cannot be justified.
4. Officers should never use warning shots for any purpose. Warning shots endanger the lives of bystanders, and in addition, may prompt a suspect to return the fire. Further, officers should never fire from a moving vehicle.
5. Officers should be allowed to use <u>any necessary force, including deadly force, to protect themselves or other persons from death or serious injury</u>. In such cases, it is immaterial whether the attacker has committed a serious felony, a misdemeanor, or any crime at all.
6. In order to enforce firearms use policies, department regulations should require a detailed written report on all discharges of firearms. All cases should be thoroughly investigated to determine whether the use of firearms was justified under the circumstances.

## Institute of Government Affairs

In 1968, the University of Wisconsin Institute of Government Affairs published a model deadly force policy,[11] the basis of which is presented below:

Deadly force can be used only as a last resort and then only:
(a) When an officer reasonably believes that he or others are threatened by death or great bodily harm; or
(b) To make a legal arrest for a felony which normally causes or threatens death or serious bodily harm to the officer or others, or which involves the breaking and entering of a building, and the officer reasonably believes that the arrest cannot be made, or custody otherwise retained or regained . . .

An officer may use deadly force in self-defense only as a last resort and only if he reasonably believes that such force is necessary to prevent death or great bodily harm.

An officer is privileged to defend a third person from real or apparent unlawful interference by another under the same conditions and by the same means applicable to the privilege of self-defense . . .

## American Bar Association

In 1972, the American Bar Association published its recommended standard for police use of deadly force[12] as follows:

. . . In order to maximize the use of the special authority and ability of the police, it is appropriate for government, in developing objectives and priorities for police services, to give emphasis to those social and behavioral problems which may require the use of force or the use of special investigative abilities which the police possess. Given the awesome authority of the police to use force and the priority that must be given to preserving life, however, government should firmly establish

the principle that the police should be restricted to using the minimum amount of force necessary in responding to any situation.

## National Organization of Black Law Enforcement Executives

In 1979, NOBLE adopted the following use of deadly force policy:

> Whereas, legitimate circumstances exist in which police officers must use their weapons, and
>
> Whereas, it is the sworn duty of police and other law enforcement agencies to uphold the United States Constitution and to protect the lives and general welfare of the public, and
>
> Whereas, many police departments do not have clear-cut policies on the use of firearms and thus fail to provide adequate direction to officers in life-and-death situations, and
>
> Whereas, the absence of these guidelines is unfair to communities, individual police officers, and their agencies, now therefore be it
>
> Resolved, by the National Organization of Black Law Enforcement Executives, that police departments and other law enforcement agencies formulate strict policy guidelines governing the use of firearms, and be it
>
> Further Resolved, that these policy guidelines be based on the principle that officers may not draw or discharge their weapons except to protect their lives or the lives of innocent citizens from imminent danger, and be it
>
> Further Resolved, that police departments design and enforce strong sanctions against officers who unwarrantedly discharge their firearms . . .[13]
> rantedly discharge their firearms . . .[13]

## United Nations

The United Nations in 1979 released their Code of Conduct[14] which is intended to guide all law enforcement officers in the use of force:

> Law enforcement officials may use force only when strictly necessary and to the extent required for the performance of their duty.

## American Civil Liberties Union

In 1979, the ACLU recommended the following deadly force policy:

> Every member shall in all cases use only the minimum amount of force necessary to accomplish the mission, and shall exhaust every other reasonable means of defense or apprehension before resorting to the use of firearms.
>
> No member shall discharge a firearm in the performance of police duties except when a clear and present danger of death exists to himself or another person and only then as a last resort.
>
> Violation of the deadly force policy may subject the officer to administrative discipline, suits for damages and criminal prosecution.[15]

61

[1]Hubert Williams, *A Community Concern: Police Use of Deadly Force* (Washington, D.C.: U.S. Department of Justice, LEAA, NILECJ, 1979).

[2]Colin Greenwood, *Police Tactics in Armed Operations* (Colorado: Paladin Press, 1979), p. 15.

[3]Dan Hollingsworth, *The Living Textbook*, Vol. 105 (Oklahoma City, 1980) "If you're not going to be out there and stand up and be counted alongside me when somebody is going to die and the question is 'will it be me?', then don't try to tell me anything about it."

[4]Lawrence W. Sherman, "Execution Without Trial: Police Homicide and the Constitution," *Vanderbilt Law Review*, Vol. 33, No. 1 (Jan. 1980), p. 97.

NOTES: Regarding FBI Policy:

*A memorandum from FBI Director J. Edgar Hoover to Attorney General Nicholas DeB. Katzenbach (April 14, 1966):

". . . with respect to the use of firearms in connection with official duties is relatively simple and certainly comes within the moral, ethical and legal framework governing the use of force by a law enforcement officer in performance of duty. We teach our personnel, and the same policy is advocated at firearms schools by our firearm experts, that a law enforcement officer should use only that degree of force necessary to overcome resistance to a legal duty he must perform. In other words, an officer should use his firearm only for self-defense of another . . ."

*FBI Memorandum 31-72 (Nov. 21, 1972) quoted in: *Mattis v. Schnarr*, 547 F.2d 1007, 1015 (8th Cir. 1976):

"An agent is not to shoot any person except, when necessary, in self-defense, that is, when he reasonably believes that he or another is in danger of death or grievous bodily harm."

*An unsigned letter from the FBI to Ronald L. Gainer, Acting Deputy Assistant Attorney General, U.S. Department of Justice (November 23, 1979).

"In response to your inquiry requesting our policy regarding the use of deadly force, the FBI's longstanding policy regarding the use of firearms and/or force directs that:

1) Special Agents will use firearms only in defense of themselves or other persons wherein it reasonably appears that they are in danger of death or grievous bodily harm.

2) Special Agents will use force as necessary to effectively and expeditiously make an arrest but no force in excess of that which is actually required.

3) Special Agents may draw a firearm to the ready when making an arrest if it appears reasonable or likely under the specific circumstances that they might be confronted with existing deadly force.

4) Special Agents may not fire a warning shot to stop a fleeing person or for any other purpose."

*William H. Webster, Director FBI, *Criminal Justice*, National League of Cities (Sept. 1980)

"In training we instruct all our special agents that the use of deadly force is permitted only when the agent or an innocent party is threatened with death or grievous bodily harm."

*The Legal Handbook for Special Agents (FBI, 1981, p. 32).

"Agents are not to shoot any person except as necessary in self-defense or the defense of another, when they have reason to believe they or another are in danger of death or grievous bodily harm."

[5]Mona Margarita, "Killing the Police: Myths and Motives," 452 *Annals of American Academy of Political and Social Science*, 63 (November 1980).

[6]International Association of Chiefs of Police, *The Police Yearbook* (Washington, D.C.: IACP, 1940).

[7]International Association of Chiefs of Police, *Recommended General Order Discharge of Firearms* (Washington, D.C.: IACP, 1966).

[8]International Association of Chiefs of Police, Official Resolution adopted by the membership pursuant to Article VII, Section 4 of the IACP Constitution. (St. Louis, Missouri, September 1980).

[9]The American Law Institute, *Model Penal Code*, Proposed Official Draft, § 3.07 (1962).

[10]The President's Commission on Law Enforcement and Administration of Justice, *Task Force Report: The Police*, (Washington, D.C.: U.S. Government Printing Office, 1967), p. 189.

[11]Fred A. Wileman, *Model Policy Manual for Police Agencies* (Institute of Government Affairs, University of Wisconsin, 1968), Sec. 800.

[12]American Bar Association, *Standards Relating to the Urban Police Function* (New York: American Bar Association, 1972), Standard 2.4, p. 74.

[13]National Organization of Black Law Enforcement Executives, Official Resolution (Newark, New Jersey, September 16, 1979).

[14]General Assembly of the United Nations, Article 3, *Code of Conduct for Law Enforcement Officials* (New York: United Nations, 1979).

[15]Symposium on Contemporary Issues in Police-Community Relations, Criminal Justice Institute: Broward Community College (1979).