# Exhibit "D"

# Street Survival

## TACTICS for ARMED ENCOUNTERS

Special Agent
**Ronald J. Adams**
Lieutenant
**Thomas M. McTernan**
**Charles Remsberg**

# APPROACH TO DANGER | 3

To wait until you need to draw and fire your gun to think about survival tactics is like waiting until you're coughing up blood to think about annual physical checkups. You should have survival in your conscious thoughts the moment you receive an assignment, for the moves you make at the outset may directly affect the outcome. By properly planning your approach to a call, you may be able to *prevent* a shooting from occurring. Or, if that proves impossible, you will have positioned yourself where you are exposed to the least risk and have the best chance of responding safely when danger does erupt.

Where many officers go wrong is in assuming that an assignment is inconsequential and therefore approaching it on what amounts to automatic pilot. They fail to consider that, going in, there is a great deal about *any* situation and the people involved that they do not—cannot—know. Presuming one set of circumstances on the basis of appearances or past experience, they may find themselves confronting quite another, for which they are not prepared. In Oregon, for example, a sergeant who stopped to help a teenage couple in a disabled car did not know the girl was an escapee or that they would kill him because they thought he intended to arrest her. A Milwaukee patrolman responding to a disturbance at a house where police had been fifty previous times without incident did not know that this time the husband beating his wife had picked up a .30-06 rifle on his way home and would shoot the officer for "messin' in." A Georgia officer who walked up to the door of a cocktail lounge that was ajar after normal closing time did not know—until he was shot dead—that an armed burglar was inside.


priests trying
victim into
hand. How
eir perception



45

When you observe a problem on the street or receive an assignment from a dispatcher, all you know for certain is the general direction in which to proceed. What you'll find when you arrive, there's no way of telling.

With a survival orientation, you keep this firmly in mind and *always approach a situation anticipating an armed confrontation.* In many cases, as we know from the common patterns of encounter, an offender has a plan in mind for how he will shoot. So you want to plan ahead, too, but you'll have to let the *circumstances dictate tactics,* not vice versa.

Each step of the way, you consider the opportunities an offender might have for shooting at you and the ways in which you might forestall or respond to an attack. In other words, you make a habit of figuring, "If 'A' happens, I'm going to do 'B,'" adjusting for new developments as you go. It's a habit you practice faithfully, regardless of your assignment. However crude, you discuss your planned movements with your partner and rehearse them mentally, and have a back-up plan in mind in case the first fails. Once the action starts, you won't have time to think things out rationally. *You have to be ready to carry out your plan instinctively*, with a minimum of hesitation, which we call "lag time."

Whenever possible, you want to *cultivate tactics that are unexpected*, to be "systematically unsystematic." Often assailants count on officers responding in predictable, "routine" ways to assignments, and if you are able to depart from stereotyped law enforcement procedures in your approach, you may be able to thwart an assailant's plan while strengthening your own position.

With some calls—"shots fired," "man with a gun," crimes-in-progress and disturbances where a firearm may be available—you have an early warning of possible violence. In other situations, you may have to depend on being observant and applying a "sixth sense" for trouble. Usually there is *some* clue or "danger sign" to violence, something about a scene or a suspect's behavior that isn't quite right. It may involve unusual nervousness on his part or so small a thing as his undue concern with watching you in his rear-view mirror as you approach on a traffic stop. With tactics and a mental attitude that stress anticipation, you'll be in the best position to see the warning...to recognize it...and to pay attention to it.

Many officers get themselves shot at by approaching an assignment carelessly, hastily, sloppily and with overconfidence. Uneventful familiarity breeds complacency. As an armored car driver in Connecticut said after three of his fellow guards

Here are
help you *plan*
variety of co
sarily bluepr
every instanc
will want to

## Building A

A scenar
in the FBI's
officers kille
disturbance
toward the fr
lishment inv
priate action
rifle or handg
He answers a
as easily as
chest.

Modern
scene of any
are greater th
action is still
is still in the
to *locate* the
*late* the offe
*eliminate* th
But there's n
eration in doi
anticipating
are very often
dom by com
they're invol
cide. "Amat
drunks, are
they're doing
passion of th
pared and det

What yo
may delay a
until you hav
are confronti

46

### Firearms Readiness

Obviously, you cannot have your sidearm out and ready to use *every* time you answer a radio call, conduct a field interview or make a traffic stop. Even if department policy and common sense permitted, it would not be wise. Sidearms and shotguns indiscriminately drawn and displayed will frighten and offend civilians and may, in fact, provoke violence in some situations that could otherwise be peacefully resolved.

Many officers, however, do not draw their sidearms when they *should*. Back-up officers arriving at the scene where an officer has been killed often discover to their amazement that the victim's sidearm is still holstered, with no evidence he attempted to draw, shoot or otherwise defend himself. Yet in many of these instances, there was prior warning of danger.

The rule has been: don't draw unless you intend to shoot. That suggests you wait until the last instant to get your sidearm in your hand. The survival approach is: don't draw unless you are *prepared* to shoot, mentally and tactically, if you have to. This allows for the fastest possible "draw": having your sidearm in your hand *before* the fight starts. You should have your firearm ready whenever:

1. you are approaching a situation where you know or reasonably believe someone has physical possession of a deadly weapon;

2. you are involved in a high-risk activity, such as a building search or have responded to a violent crime-in-progress, or

3. you have any reason to fear for your safety or the safety of others.

When in doubt, you may want to go with your gun and risk ruffling a few community relations feathers rather than risk becoming the victim at your own funeral.

Another aspect of firearms readiness is having the most effective gun in hand for a confrontation. The most powerful and intimidating weapon, if made available on patrol by your department, is a .12 ga. shotgun with an 18- or 20-inch barrel; yet its impressive versatility for use in making an approach is often overlooked and misunderstood.

When you take it from your patrol car, a shotgun may make a strong psychological impact. Its appearance and reputation may be enough in themselves to sober a suspect who's considering shooting you. You can induce an additional "pucker factor" with the ominous noise of "racking" the action. Once heard, in the still of the night, it's a sound never forgotten. If you are justified in using deadly

## ATTACHMENT C
## FORCE CONTINUUM



AGGRAVATED ACTIVE AGGRESSION

ACTIVE AGGRESSION

ACTIVE RESISTANCE

PASSIVE RESISTANCE

VERBAL NONCOMPLIANCE

PSYCHOLOGICAL INTIMIDATION

OFFICER PRESENCE
- Identification of authority

VERBAL DIRECTIONS
- Notification of arrest
- commands of direction

SOFT CONTROL
- Techniques that have a minimum probability of injury.
1. Pressure points
2. Wrist locks
3. Arm bars
4. Pain compliance
5. Chemical agents
6. Distractors

HARD CONTROL
- Techniques that have a higher probability of injury.
1. Forearm strikes
2. Knee strikes
3. Open/closed hand strikes
4. Jabs with baton
5. Strikes with baton
6. Kicks with legs
(The above hard control techniques shall not target above the shoulders, the spine, or the solar plexus.)
7. Approved takedowns

INTENSIFIED TECHNIQUES
- Techniques necessary to overcome the force of the suspect short of deadly force

DEADLY FORCE

OFFICER/SUBJECT FACTORS TO BE CONSIDERED
- Age
- Sex
- Size
- Skill level
- Multiple subjects or officers

SPECIAL CIRCUMSTANCES
- Mental incapacity
- Close proximity to firearm
- Special knowledge
- Injury or exhaustion (officer/suspect)
- Imminent danger
- Availability of weapons
- Arrestee's level of agitation
- Alcohol drug influence
- Arrestee handcuffed
- Destruction of evidence
- Nature of the crime

(The above techniques are guidelines)

## ATTACHMENT C (CONTINUED)
## FORCE CONTINUUM DEFINITIONS

| SUSPECT'S LEVEL OF RESISTANCE | OFFICER'S LEVEL OF CONTROL |
|---|---|
| **PSYCHOLOGICAL INTIMIDATION**<br>-Nonverbal cues indicating subject's attitude, appearance, and physical readiness. | **OFFICER'S PRESENCE**<br>-Identification of authority. |
| **VERBAL NONCOMPLIANCE**<br>-Verbal responses indicating an unwillingness to cooperate. | **VERBAL DIRECTIONS**<br>-Notification of arrest.<br>-Commands of direction. |
| **PASSIVE RESISTANCE**<br>-Arrestee is taking no action toward the officer but the arrestee's position or failure to obey commands prevents the arrest (i.e., arrestee locks hands together under their body to prevent handcuffing. | **SOFT CONTROL**<br>-Techniques that have a minimum probability of injury:<br>  -Pressure points<br>  -Wrist locks<br>  -Arm bars<br>  -Pain Compliance holds<br>  -Chemical agents<br>  -Distractors |
| **ACTIVE RESISTANCE**<br>-The arrestee's actions are intended to facilitate an escape or prevent an arrest. Actions are not intended to injure the officer. | **HARD CONTROL**<br>-Techniques that have a higher probability of injury:<br>  -Forearm strikes<br>  -Knee strikes<br>  -Open or closed hand strikes<br>  -Jabs with the baton<br>  -Kicks to the legs<br>(The above hard control techniques shall not target above the shoulders, on the spine, or on the solar plexus.)<br>  -Approved takedowns |
| **ACTIVE AGGRESSION**<br>-When the arrestee has battered, or is about to batter, a person/officer and where the arrestee's action is likely to cause injury to the person/officer. | **INTENSIFIED TECHNIQUES**<br>- Those techniques necessary to overcome the force of the suspect short of deadly force. |
| **AGGRAVATED ACTIVE AGGRESSION**<br>-Arrestee's force is likely to cause death or great bodily harm. | **DEADLY FORCE**<br>-Use of deadly force is necessary. Officer must react immediately to protect human life from death or great bodily harm. |

Case 6:10-cv-01367-SDM-EAJ   Document 40-11   Filed 07/01/11   Page 9 of 10 PageID 355

# THE LAW ENFORCEMENT trainer

## THE OFFICIAL JOURNAL OF THE AMERICAN SOCIETY FOR LAW ENFORCEMENT TRAINING

volume 19, number 2 • march/april 2004

www.aslet.org



## The Con Artists of the Future:
### State-of-the-Art Tools for State-of-the-Art Criminals

# officer SURVIVAL

BY DAVE GROSSI



Dave Grossi is a retired Police Lieutenant from upstate New York. He now splits his time between homes/offices in Naples, Florida, and Denver, Colorado. For 12 years, Dave was the Lead Instructor for the Calibre Press, Inc. Street Survival Seminars. A Vietnam combat veteran, he serves on the Executive Board of ASLET and testifies frequently as an expert witness in defense of police officers in use of force cases.

{ *Guarantees? Nope. There aren't any. But maintaining an adequate reactionary gap can stack the odds in your favor.* }

# Remembering the "Reactionary Gap"

## Dateline: Texas

A "domestic" call at a local Denny's restaurant prompts the dispatch of two San Antonio police officers. During the initial interview of the parties involved, one of the principals discloses that the suspect in the "domestic" is carrying a concealed handgun. Before either officer can react, the suspect attacks one of them, momentarily putting him down, then jumps the other officer and disarms him of his holstered service weapon. The suspect then fires three rounds into the now disarmed officer, fatally wounding him. A fourth round is then pumped into the first down officer.

## Dateline: Rhode Island

Two state troopers pull over a suspected DWI/DUI in a convenience store parking lot. During the course of making the vehicle stop, the lone driver is seen reaching toward the console and then putting his hand up to his mouth area. After exiting the car, the intoxicated driver keeps his head down and constantly mumbles his responses. Unsteady on his feet, the driver begins to fall toward the interviewing trooper. A scuffle ensues with the driver sustaining significant injuries. The end result is dismissed DUI/DWI charges against the driver and an excessive force lawsuit against both troopers.

## Dateline: Washington

A King County Sheriff's Office deputy, in the midst of a foot chase with a naked "crack head," manages to outrun his coked-up suspect. Upon catching up to the doper, the deputy manages to take him to the ground. A wrestling match ensues. During the ground altercation, the suspect manages to get the deputy's gun out of his holster and fatally shoots him with it.

## Dateline: New York

A police officer searching a backyard on a "domestic with a prowler" call encounters the suspect hiding in some bushes. Recognizing the suspect as an old school chum, the officer offers his hand to help the suspect off the ground. The suspect takes that opportunity to grab the officer's gun out of his holster, fires one shot into the officer's leg and then a second shot at the officer's partner.

Four incidents resulting in two fatally wounded officers, two more seriously injured and two others sued. The common denominator? The failure to realize the importance of maintaining adequate distance between officers and suspects who are being questioned or detained. Prior to the late 1980s, officers equated being close with being in control. In reality, nothing is further from the truth. In fact, the closer you are to an unsecured or unsearched suspect, the more dangerous that situation is for you.

"Reactionary gap" is defined as "the minimum amount of space needed to ensure that you can properly react to whatever threat may be presented by a suspect being questioned or detained." The first concept to remember when considering the "reactionary gap" is the "I-stance." The Interview Stance was developed to ensure that officers performing field or street interviews position themselves close enough to speak to their subjects in a normal voice and be able to hear the subject's responses, yet far enough away that they don't become vulnerable to a physical attack. It's really a balance between safety and efficiency. Next, remember "police proxemics," defined as "the distance between an officer and the threat posed by certain weapons." Some numbers to keep in mind are:

- Firearms threats: generally your safety zone is defined as "line of sight unbroken by cover."