# Exhibit "D"

# DEADLY FORCE:



## What We Know

### A Practitioner's Desk Reference on Police-Involved Shootings

William A. Geller
Michael S. Scott



POLICE EXECUTIVE
RESEARCH FORUM

Television and the movie screen have generally portrayed the wild west sheriff and the contemporary police officer as a sharp shooter who could shoot the eye out of a gnat. Whereas in reality many police officers have a difficult time meeting departmental qualification standards at the firing range, let alone during a combat situation.

In a Michigan study[16] of 551 incidents in which a firearm was used by police and one or more persons were fatally or nonfatally injured, 43 percent of the suspects were shot at and missed. Mayer[17] reported that in Los Angeles, 38 percent were missed. In Chicago, Geller[18] reported a miss rate of 82 percent.

These results are probably typical of our nation's police officers' ability to hit a live target under combat conditions. The results certainly dispel any potential to "shoot the gun out of the assailant's hand," "shoot a leg or arm" or "shoot to wound."

Officers have traditionally been trained to shoot at center body mass. It is now time to place the training standard in policy statement. Such a policy should increase the hit rate and lend greater safety support to the officer that the shooting will stop the assailant.

## DEFENSE OF LIFE

*An officer may use deadly force to protect himself or others from what he reasonably believes to be an immediate threat of death or (near death) critical bodily harm.*

The three major legal standards — common law, modified common law, and the model penal code — are surrounded by numerous "model" policies, resolutions, and guidelines. Without exception, each of the policy models includes a police self-protection clause and a defense-of-the-third-party life clause. Clearly, an officer must have an honest, sincere, and personal belief that his life or the life of another is in immediate danger. Where he has such a belief, it is unconscionable to expose his own life or another innocent person's by not permitting use of deadly force against the suspected criminal assailant. The minimum standard for defending the self-defense position should be the reasonableness which is expected of a well-trained, prudent police officer. His resort to deadly force to protect another should be guided by the same standard as is permitted for his self-protection. The judgment of reasonableness should be by other police officers with similar distilled experience, education, and training who can be objective and intelligent while recognizing the complete scenario. Justification for the use of deadly force must be limited to the facts known to the officer or perceived by the officer at the time he decides to shoot. Facts unknown to the officer must not be considered in later determining justification of the shooting.

In assuming the responsibility for self-defense, the officer should not be required to unreasonably place himself in situations where deadly force is presumed imminent. Likewise, an officer should not be censured or disciplined if he chooses not to employ deadly force in situations where others may, after the fact, reason that situation clearly authorized the use of such force.

## SIGNIFICANT THREAT

*An officer may use deadly force to effect the capture or prevent the escape and the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.*

The entire issue of using deadly force against a misdemeanant versus a felon seems to have been caught up in a dated controversy. The original definitions of the terms misdemeanor and felony have long been lost in time. Many crimes have been added to the felony category that present no immediate threat of danger to the police officer (e.g., conspiracy to defraud, embezzlement). Conversely, statistics indicate that when police officers are killed, more than 30 percent of the encounters begin with a misdemeanor crime or lesser confrontation.[19] Also see Table 8.1.

There are times when the officer's life or the life of a third party is not in immediate danger yet the situation is so serious that deadly force may be authorized. Such circumstances[20] might include where an injured officer cannot escape and must shoot to prevent a suspect from going to an adjoining room and arming himself, it being

69

USE OF FORCE

# Model Policy

| Effective Date<br>February 1, 1989 | | Number |
|---|---|---|
| Subject<br>Use of Force | | |
| Reference<br>Deadly Force, Nondeadly Force, Firearms, Non-Lethal Weapons | | Special Instructions |
| Distribution | Reevaluation Date<br>January 31, 1990 | No. Pages |

## I. PURPOSE
The purpose of this policy is to provide police officers with guidelines on the use of deadly and nondeadly force.

## II. POLICY
This department recognizes and respects the value and special integrity of each human life. In vesting police officers with the lawful authority to use force to protect the public welfare, a careful balancing of all human interests is required. Therefore, it is the policy of this department that police officers shall use only that force that is reasonably necessary to effectively bring an incident under control, while protecting the lives of the officer or another.

## III. DEFINITIONS
A. *Deadly force:* Any use of force that is likely to cause death or serious bodily harm.
B. *Nondeadly force:* Any use of force other than that which is considered deadly force.

## III. PROCEDURES
A. Parameters for use of deadly force:
 1. Police officers are authorized to fire their weapons in order to:
    a. Protect the police officer or others from what is reasonably believed to be an immediate threat of death or serious bodily harm; or,
    b. Prevent the escape of a fleeing felon whom the officer has probable cause to believe will pose a significant threat to human life should escape occur.
 2. Before using a firearm, police officers shall identify themselves and state their intent to shoot, where feasible.
 3. A police officer may also discharge a weapon under the following circumstances:
    a. During range practice or competitive sporting events.
    b. To destroy an animal that represents a threat to public safety, or as a humanitarian measure where the animal is seriously injured.
 4. Police officers shall adhere to the following restrictions when their weapon is exhibited:
    a. Except for maintenance or during training, police officers shall not draw or exhibit their firearm unless circumstances create reasonable cause to believe that it may be necessary to use the weapon in conformance with this policy.
    b. Warning shots are prohibited.
    c. Police officers shall not fire their weapons at or from a moving vehicle.
    d. Firearms shall not be discharged when it appears likely that an innocent person may be injured.
B. Parameters for use of nondeadly force:
 1. Where deadly force is not authorized, officers should assess the incident in order to determine which nondeadly technique or weapon will best de-escalate the incident and bring it under control in a safe manner.
 2. Police officers are authorized to use department-approved nondeadly force techniques and issued equipment for resolution of incidents, as follows:
    a. To protect themselves or another from physical harm; or
    b. To restrain or subdue a resistant individual; or

This Model Use of Force Policy was developed under the auspices of the Advisory Board of the IACP/BJA National Law Enforcement Policy Center. A Concepts and Issues paper discussing key decision points and controversial issues pertaining to Use of Force may be purchased for $5.25 plus $1.00 for postage and handling by sending your order to the IACP/BJA National Law Enforcement Policy Center, 1110 North Glebe Road, Suite 200, Arlington, VA 22201.

  c. To bring an unlawful situation safely and effectively under control.
C. Training and qualifications:
 1. Deadly weapons:
  a. While on-and off-duty, police officers shall carry only weapons and ammunition authorized by and registered with the department.
  b. Authorized weapons are those with which the police officer has qualified and received departmental training on proper and safe usage, and that are registered and comply with departmental specifications.
  c. The police department shall schedule regular training and qualification sessions for duty, off-duty and specialized weapons, which will be graded on a pass/fail basis.
  d. Police officers who fail to receive a passing score with their duty weapon(s) in accordance with department testing procedures shall be relieved of their police powers and immediately reassigned to nonenforcement duties.
  e. A police officer shall not be permitted to carry any weapon with which he has not been able to qualify during the most recent qualification period.
  f. A police officer who has taken extended leave or suffered an illness or injury that could affect his use of firearms ability will be required to requalify before returning to enforcement duties.
 2. Nondeadly force weapons and methods:
  a. A police officer is not permitted to use a nondeadly weapon unless qualified in its proficient use as determined by training procedures.
  b. The following nondeadly weapons are authorized: _____
  (Department should insert its own list here.)

D. Reporting uses of force:
 1. A written report prepared according to departmental procedures will be required in the following situations:
  a. When a firearm is discharged outside of the firing range.
  b. When a use of force results in death or injury.
  c. When a nonlethal weapon is used on a person.
 2. A supervisor will be immediately summoned to the scene and will comply with investigative procedures as required by the department in the following situations:
  a. When a firearm is discharged outside of the firing range.
  b. When a use of force results in death or serious injury.
  c. When a subject complains that an injury has been inflicted.

E. Departmental response:
 1. Deadly force incident
  a. Where a police officer's use of force causes death, the officer shall be placed on administrative leave after completing all internal investigative requirements, and until it determined by a mental health professional tha the police officer is ready to return to duty.
  b. The department shall conduct both an administrative and criminal investigation of th incident.
 2. Administrative review of critical incidents:
  a. All reported uses of force will be reviewed b the appropriate departmental authority t determine whether:
   (1) Departmental rules, policy or procedure were violated;
   (2) The relevant policy was clearly understandable and effective to cover the situation;
   (3) Department training is currently adequate
  b. All findings of policy violations or trainin; inadequacies shall be reported to the ap propriate unit for resolution and/or discipline.
  c. All use of force incident reports shall be retainec as required by state law.
  d. There will be a regular review of use of forc incidents by the appropriate departmenta authority to ascertain training and policy needs
  e. An annual summary report of use of forc incidents will be published and made availabl to the public.

---

**WARNING**
This directive is for departmental use only and does not apply in any criminal or civil proceeding. The department policy should not be construed as a creation of higher legal standard of safety or care in an evidentiary sense with respect to third party claims. Violations of this directive will only form the basis for departmenta' administrative sanctions.

---

By order of:

_____
Signature of Chief of Police

---

The IACP Model Use of Force Policy is intended to serve as a guide for the law enforcement executive who is interested in formulating a writt- procedure to govern use of force in his department. The law enforcement executive is advised to refer to all federal, state and municipal statutes, ordinance regulations, and judicial and administrative decisions to ensure that the policy he seeks to implement meets the unique needs of the jurisdiction.

# THE SUSPECT IS SHOT IN THE BACK.

# Is Your Shooting Clean?

## Understanding the Limits of Survival Psychology

*By Bill Lewinski, Ph.D. and Dave Grossi*

### Dateline: Flint, Michigan

It's Halloween night. You're on patrol, working a two-person unit. Officers are deployed throughout the city to keep an eye on the trick-or-treaters who are out in force. Groups of young people are walking the streets. In addition to the costumed gremlins and goblins, a local street gang is hanging out by a park. Suddenly a shot rings out. You hit the lights and head toward the group. The gang starts to flee. You see one of the gangbangers raise a large-frame revolver in the air and begin running across a field. "Police, stop!" Suddenly, the suspect starts to turn toward you and swing the revolver in your direction. With no cover available, you fire one round and the suspect goes down. A fatal shooting. The autopsy shows the suspect, a 15-year-old kid, has been struck in the back.

### Dateline: Providence, Rhode Island

Burglary-in-progress call. Homeowners return to find their house being ransacked. A television and stereo are stacked in front of the sliding glass doors and a suspect is seen running out of the rear of the home. As your partner interviews the victims, you head out the back door. You catch a glimpse of a suspect jumping a fence and call out the foot pursuit to alert other responding units. "Police, stop!" While running, the suspect turns in your direction. You see the glint of a shiny object in his hand. You fire and he goes down. You make your approach and see the object the suspect was pointing toward you is a screwdriver. The subject, who survives, has been hit in the back by your shot.

### Dateline: Oakland, California

"16 Robert 3. Possible drug dealing at 78th and Collins. Two youths on bicycles and a brown sedan involved." Upon arrival, you see a youth on a bike take off and the two occupants of the brown vehicle eyeball you as you pass by. As you negotiate your K-turn to call in the plate, the vehicle drives off and pulls into a driveway. You call out the plate, exit your squad and start an approach to the driver's door. Suddenly, the passenger door opens and the second subject starts to flee. As you move toward the rear of the car, you see a gun in the suspect's right hand. "Stop, police!" Rather than stop, the suspect twists to his left and starts to point the gun in your direction. With no available cover, you're forced to shoot two quick shots. The suspect goes down. You make an approach and secure the firearm. EMS responds and you discover your shot hit the suspect in the upper right-hand shoulder and he's DOA.

### Action/Reaction: An Overview

The above scenarios all happened. While the circumstances of each were different, the obvious similarity was that the suspect in each incident had been hit in the back by the officer's shots. Of all the possible shooting scenarios that officers might think of during crisis rehearsal exercises, one that probably never pops into their minds is where they shoot a suspect in the back. Just the thought of such a situation in the minds of civilians conjures up images of a police execution. While we as police professionals know that such is not the case, how do you explain to the DA, your supervisors, a civilian jury or review board how something like that could happen?

We know that in many police shootings, officers will reenact the details of their shootings in their minds over and over again. In their reports and their testimony afterward, they will swear (under oath) that the suspect, while turning toward them, was pointing what they perceived to be a gun in their direction. In the above three scenarios, the suspects were actually running away but made definite observable turns toward the involved officers when the officer decided to use deadly force. However, just as clear was the fact that in all three cases, the suspects were struck in the back of the body.

For years, police trainers have known how the action/reaction phenomenon can play into such a situation. In fact, co-author Dave Grossi testified in federal court and demonstrated to the judge and jury how the action/reaction phenomenon in the first incident attributed to the bullet strike appearing in the suspect's back. The demonstration was convincing enough that the jury exonerated the officer. In the second incident, Grossi explained to the jury both action/reaction and the bio-mechanics of body movement. In that case, the jury also was convinced that the shooting was justified. The action/reaction phenomenon also resulted in a Montreal, Quebec police sergeant being exonerated when Grossi demonstrated it as part of his expert defense testimony in a fatal SWAT shooting.

In the third incident, the case was settled the weekend before it was scheduled to begin. In that case, where both Grossi and co-author Dr. Bill Lewinski were retained as defense experts, the

## THE SUSPECT IS SHOT IN THE BACK.

heart and soul of the defense centered on both the action/reaction phenomenon and the concept of survival psychology.

Previous attendees of the Street Survival® Seminar, produced by Calibre Press, will probably remember the action/reaction demonstration that Grossi performed during his Deadly Force block of instruction. Over 300 such demonstrations presented at the seminars by use of specially modified training guns loaded with cotton ball bullets showed attendees exactly how perception time, brain lag, response time all contributed to volunteer/officers being "shot" by "suspect" Grossi, even though Grossi had to execute a full 180-degree turn to acquire the officer as a target before pulling the trigger. It would seem that the officer always had the edge because he was allowed to have his gun out and pointed toward the "suspect." Plus, the volunteer officer knew that Grossi was armed with a gun since it was inspected and declared safe before the demonstration began; also he knew that most likely Grossi was going to point the gun at him and he would need to defend himself. Past seminar attendees know that despite the apparent tactical edge in favor of the officer, Grossi won a lot of gun fights during these demonstrations. Now, a study conducted by Lewinski has revealed not only why and how such a situation can happen but also that it may be impossible to prevent it. According to Lewinski, the answer lies in "Survival Psychology."

### Survival Psychology

When an officer gets the signal that his life is in danger, his concentration becomes exclusively focused on the threat, specifically the movement of the gun in his direction. Basically, he is simply not aware of any shoulder or hip movement that might be signaling that the suspect is turning back away from him. Furthermore, Lewinski found that once the brain decides it's time to shoot, it is virtually impossible to interrupt the completion of that action. In over 600 cases of shooting decisions examined by Lewinski over a seven-year period, he could find only one in which an officer was able to keep himself from firing at the suspect once he had made the decision to shoot and had physically started pulling the trigger. Even in that one isolated case, the officer still shot, but had managed to jerk his wrist so the gun twisted away from the suspect. That round went errant into city traffic.

By using time-coded videotape, Lewinski recorded exactly how long it takes "suspects" to turn away from a stationary starting position, as if turning away from an officer who was

> ... once the brain decides it's time to shoot, it is virtually impossible to interrupt the completion of that action.



## DON'T WAIT UNTIL IT'S TOO LATE TO CALL!

Tactical & Survival Specialties Inc. offers the most comprehensive tactical catalog available.

Over 550 pages of tactical clothing and equipment.

We represent the worlds leading manufacturers.

Serving the special operations community worldwide.

All catalog requests must be in writing on command or agency letterhead.

**TACTICAL & SURVIVAL SPECIALTIES, INC.**
1832 South Main Street Box PM, Harrisonburg, VA 22801
Phone: 1-540-434-8974 Fax: 1-540-434-7796

GSA Contract #GS-07F-9123D Call for GSA Pricing

Circle No. 16 on Reader Info Card

# THE SUSPECT IS SHOT IN THE BACK.

attempting to deal with them. During Bill's studies, he had some "suspects" standing full-face toward the camera, while some started out standing sideways to the camera. Whenever the "suspect" decided to act, (per Bill's instructions to them during an earlier briefing) they first began to move the gun in a threatening manner and then turned away and ran. Regardless of what angle or position the "suspect" started from, they could initiate and complete the turn very quickly. In fact, the average "suspect" standing full-front toward the camera/officer took about 1/2 second (.50 second) to complete a 180-degree turn. The fastest time was about 1/3 second (.33 second). Previous studies conducted by the faculty at the Smith & Wesson Academy and one earlier joint study conducted by Dr. Martin Fackler and Ernest Tobin, as well as Grossi's own experiments during his firearms training classes, have shown that once an officer perceives a threat, like the movement of the gun in this case, it will take a minimum of 1/3 second (.33 second) up to 1.5-2.0 seconds for that officer's brain to process the information, complete his reaction, and fire his weapon in self-defense.

The conclusion is that in each of Lewinski's experiments, the "suspect" would have been hit in the back since his front would be turned away from the officer by the time the officer's reaction was complete. This would be true even if the officer had his gun up at eye level, aimed center mass on target, when the suspect started to turn.

Lewinski did some other experiments where suspects were running away and then turned to fire shots back toward the officer as they ran, either under their arm or over their shoulder, similar to Grossi's action/reaction seminar demonstrations. The average time to complete either of these movements was approximately 1/4 second (.24 second). Again, the suspect could turn back around after shooting and be in a whole different position by the time a defensive shot from an officer would hit him. Lewinski's studies concluded that no matter how well you're "set" psychologically, you're still limited by your neuromuscular reaction time.

## Summary

Some shooting situations are simply unavoidable. Since we, as police officers, are many times forced to react to the suspect's provocation, our responses are often affected by the action/reaction phenomenon. Also, in many situations, cover just isn't available and deadly force is the only option. As a result, in some deadly force confrontations which are fully justified, the threatening suspect may end up being hit in the back as a result of your reactive deadly force response. In those cases, the media, special interest groups, angry family members and plaintiff's attorneys may all try to ignore the details of why the shooting was justified and get the focus on the fact that since the suspect was struck in the back, your shooting was nothing more than a "cold-blooded murder." The media hype could be incredible, the psychological impact devastating, and the legal ramifications career-ending. The relevant facts of the shooting many not even be addressed. What will become the focus in court and in the media will be "since the suspect was shot in the back" the shooting was unjustified - the officer was wrong.

Unfortunately, your defense counsel, although knowledgeable in civil rights litigation, may not know how to prepare an effective defense in such a case. In those matters, it is going to be critical that your attorney be educated not only on the action/reaction phenomenon, but also the characteristics of survival psychology. Furthermore, he should also be willing to present expert testimony, coupled with demonstrative evidence so that a judge or jury will be able to base their decisions on scientific facts rather than emotional rhetoric, meant only to skew the real issues of the shooting.

Lewinski's research has been added to material on Deadly Force Decisions material and is now being presented by Grossi at the Street Survival® Seminars. For more information on the action/reaction phenomenon, survival shooting techniques and survival psychology, contact: Calibre Press at (800) 323-0037. ☆

### About the Author

*A police psychologist and professor of law enforcement studies at Minnesota State University at Mankato, Bill Lewinski, holds a Doctorate in Psychology from Union Institute in Cincinnati, Ohio. His is also a trained hostage negotiator, testifies extensively in the field of performance psychology in force-related matters, and is currently researching police response to emotionally disturbed persons.*

*Dave Grossi is the senior instructor for Street Survival Seminars. He is a retired lieutenant from the Irondequoit (N.Y.) Police Department and holds a BS in police administration. He is a graduate of the FBI National Academy and sits on the board of the Police Marksman Association. Dave has testified in both state and federal courts on use-of-force issues.*

**GET THE TACTICAL EDGE WITH THE "CHALKER SLING"**

STILL USING AN "OVER THE SHOULDER" SLING?
ASK YOURSELF WHY MAJOR SWAT TEAMS ACROSS THE COUNTRY AND SOME OF AMERICA'S MOST ELITE SPECIAL OPERATIONS UNITS USE THE CHALKER SLING.
NOW, ASK YOUR SELF WHY YOU DON'T USE THE CHALKER SLING!

DESIGNED BY COMMAND MASTER CHIEF (SEAL) DENNIS CHALKER FOR CQB APPLICATIONS, THE CHALKER SLING ELIMINATES PROBLEMS ASSOCIATED WITH CONVENTIONAL SLINGS. IT'S ADJUSTABLE, COMFORTABLE TO WEAR FOR LONG PERIODS OF TIME AND GIVES YOU THE FASTEST MOUNT POSSIBLE.

THE CHALKER SLING CAN BE USED WITH ANY SMG, CARBINE, SHOTGUN, RIFLE OR GAS GUN, AND OUR EXCLUSIVE SNAP SHACKLE FEATURE ALLOWS RAPID HOOK UP OR RELEASE FROM ANY WEAPON. IT'S A "DOOR BUSTIN'" SLING WITHOUT EQUAL!

NO "LINE OF SIGHT" INTERFERENCE    AMBIDEXTROUS DESIGN    SNAP SHACKLE FEATURE

**METRO TACTICAL PRODUCTS**
PO BOX 6533 CORONA, CA 91718  800.735.7030  METRO1097@AOL.COM

Circle No. 30 on Reader Info Card